No. 12-1429

United States Court of Appeals for the Fourth Circuit

Waugh Chapel South, LLC, et al.,

Appellants,

v.

United food and Commercial Workers Union Local 27, et. al,

Appellees.

Appeal from the United States District Court for the District of
Maryland

Brief of Appellants

**Ira L. Oring
Neil Dubovsky
Fedder and Garten Professional Association
36 South Charles Street, Suite 2300
Baltimore, Maryland  21201
410-539-2800**

**Counsel for Appellants**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of _all_ parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 12-1429          Caption: Waugh Chapel South, LLC v. United food and Commercial

Pursuant to FRAP 26.1 and Local Rule 26.1,

WCS Properties Business Trust
(name of party/amicus)

_____

who is _____ Appellant _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

      The following parent/grandparent/great-greatparent entities have a potential interest in the
      litigation:
      Waugh Chapel South, LLC; GG Cal LLC;  Brickhead LLC, Sturbridge WCS LLC, ELG Waugh
      South LLC, Brimart LLC and Marmer LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                   ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors` committee:

# CERTIFICATE OF SERVICE
****************************

I certify that on _____April 10, 2012_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Sharon M. Goodman
Laura O. Aradi
Slevin & Hart, P.C.
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC 20036

David Gray Wright
Kahn, Smith & Collins, P.A.
201 North Charles Street, 10th Floor
Baltimore, Maryland 21201

_____s/Ira L. Oring_____                    _____4/10/12_____
(signature)                                     (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 12-1429          Caption:  Waugh Chapel South, LLC v. United Food and Commercial

Pursuant to FRAP 26.1 and Local Rule 26.1,

WSC, LLC
(name of party/amicus)


who is _____ Appellant _____ , makes the following disclosure:
          (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

      Sturbridge WCS LLC and ELG WCS LLC



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on ___April 10, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Sharon M. Goodman
Laura O. Aradi
Slevin & Hart, P.C.
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC  20036

David Gray Wright
Kahn, Smith & Collins, P.A.
201 North Charles Street, 10th Floor
Baltimore, Maryland  21201

| s/ Ira L. Oring | 4/10/12 |
|---|---|
| (signature) | (date) |

- 2 -

11/17/2011
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 12-1429    Caption: Waugh Chapel South, LLC v. United Food and Commercial

Pursuant to FRAP 26.1 and Local Rule 26.1,

ELG Englewood, LLC
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on ____April 10, 2012____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Sharon M. Goodman
Laura O. Aradi
Slevin & Hart, P.C.
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC  20036

David Gray Wright
Kahn, Smith & Collins, P.A.
201 North Charles Street, 10th Floor
Baltimore, Maryland  21201

/s/ Ira L. Oring
_____          _____
      (signature)                          (date)
                                           4/10/12

11/17/2011
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 12-1429          Caption: Waugh Chapel South, LLC v. United Food and Commercial

Pursuant to FRAP 26.1 and Local Rule 26.1,

Waugh Chapel South, LLC
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

      The following parent/grandparent/great-greatparent entities have a potential interest in the litigation:

      Brickhead LLC, Sturbridge WCS LLC, ELG Waugh South LLC, Brimart LLC and Marmer LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
****************************

I certify that on ____April 10, 2012____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Sharon M. Goodman
Laura O. Aradi
Slevin & Hart, P.C.
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC 20036

David Gray Wright
Kahn, Smith & Collins, P.A.
201 North Charles Street, 10th Floor
Baltimore, Maryland 21201

| s/Ira L. Oring | 4/10/12 |
|---|---|
| (signature) | (date) |

11/17/2011
SCC

**Table of Contents**

**Page:**

Table of Authorities .................................................................................. iii

I. Jurisdiction ...................................................................................... 1

II. Statement of Issues Presented .................................................... 1

III. Statement of the Case ................................................................. 2

IV. Statement of Facts ....................................................................... 3

V. Summary of the Argument .......................................................... 6

VI. Argument ...................................................................................... 8

1. Standard of Review by this Court..................................... 8

2. The District Court erred in granting the Motions to
Dismiss the First Amended Complaint given the
substantial support for the Plaintiffs' claims that the
Defendant labor organizations had funded and directed
sham litigation as part of secondary boycott activity .......................... 8

a. Noerr-Pennington does not provide Defendants
with immunity for the filing of multiple objectively
baseless and sham litigation ....................................... 8

b. The Complaint will withstand a Motion to Dismiss
if it presents a plausible claim for relief.................................. 11

c. The Plaintiffs alleged a plausible claim that each of
the fourteen unsuccessful legal challenges and
administrative appeals was objectively baseless and
therefore stripped of *Noerr-Pennington* immunity.................. 14

1. The Motion To Rescind Zoning Filed
August 21, 2008 was sham............................................ 15

2.   The December 3, 2009 Challenge To The
     Request For Extension Of Security For The
     Public Works Agreement was sham ............................. 18

3.   March 7, 2010 Litigation Regarding Tax
     Increment Financing was sham ..................................... 20

4.   The July 1, 2010 And August 28, 2010
     Challenges To MDE's Renewal Of Mining
     Permit was sham. ......................................................... 22

5.   The June 28, 2010 "Injunctive Action" was
     sham ........................................................................... 27

6.   The appeals of Building and Grading
     Permits were sham ....................................................... 31

3.   The Complaint adequately pleads that the Mid-Atlantic
     Retail Food Industry Joint Labor Management Fund is a
     labor organization. ............................................................ 35

VII.   Conclusion ...................................................................... 44

Supplement ................................................................................ 46

1. Article 17-2-108 of the Anne Arundel County Code ............................ 46

2. 29 U.S.C. § 152(5) ............................................................... 47

3. 29 U.S.C. § 158(b)(4)(ii)(B) .................................................. 47

4. 29 U.S.C. § 187 ................................................................... 48

Statement Regarding the Need for Oral Argument ............................... 49

Certificate of Compliance ................................................................. 50

Certificate of Filing and Service ........................................................ 51

# TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) ...........................................................12, 13

<u>Balt. Scrap Corp. v. David J. Joseph Co.</u>, 237 F.3d 394 (4th Cir. 2001)............... 30

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007).............................11, 12, 13

<u>Bill Johnson's Rest., Inc. v. NLRB</u>, 461 U.S. 731 (1983) ...................................... 9

<u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971).................. 12

<u>Brockington v. Boykins</u>, 637 F.3d 503 (4th Cir. 2011) ........................................ 14

<u>Bldg. & Constr. Trades Council of Reading & Berks Cnty.</u>,
    155 NLRB 1184 (1965)...................................................................40, 41, 44

<u>California Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508 (1972) ......9, 10

<u>Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau</u>,
    690 F.2d 1240 (9th Cir. 1982) ................................................................... 11

<u>Cochran v. Griffith Energy Servs., Inc.</u>, No. 87,
    2012 WL 1499817 (Md. May 1, 2012) ...................................................... 33

<u>CSX Transp., Inc. v. Gilkison</u>, 406 Fed. Appx. 723 (4th Cir. 2010).................... 14

<u>Del Turco v. Speedwell Design</u>, 623 F.Supp.2d 319 (E.D.N.Y. 2009) .................. 4

<u>E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>,
    365 U.S. 127 (1961) ...............................................................................8, 9

<u>Igen Int'l v. Roche Diagnostics GmbH</u>, 335 F.3d 303 (4th Cir. 2003) ................. 14

<u>Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.</u>,
    760 F.2d 607 (5th Cir. 1985) .................................................................... 11

iii

Kravco Co. v. Valley Forge Ctr. Assocs., 1992 WL 97926 (E.D. Pa. 1992)......... 11

Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co.,
    370 U.S. 173 (1962). ................................................................. 43

Morrone Co. v. Barbour, 241 F.Supp.2d 683 (S.D. Miss. 2002)........................... 11

NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262 (4th Cir. 1994)............. 39

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) ................................ 10

Papasan v. Allain, 478 U.S. 265 (1986) ............................................................... 14

Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.,
    508 U.S. 49 (1993) ............................................................................10, 11

Richmond, Fredericksburg & Potomac R.R. v. Forst,
    4 F.3d 244 (4th Cir. 1993) ......................................................... 14

Schatz v. Rosenberg, 943 F.2d 485 (4th Cir. 1991)................................................. 8

Scooter Store, Inc. v. Spinlife.com, LLC,
    2011 WL 1460438 (S.D. Ohio 2011) ......................................................... 11

Smith v. Smith, 589 F.3d 736 (4th Cir. 2009) ....................................................8, 13

Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union,
    593 F.Supp.2d 840 (E.D. Va. 2008)........................................................... 11

Sugerloaf Citizens Assn. v. Dept. of the Env't,
    344 Md. 271, 686 A.2d 605 (1996)............................................................ 16

Taylor Milk Co. v. Int'l Bhd. of Teamsters, 248 F.3d 239 (3rd Cir. 2001)............. 4

Tizes v. Curcio, 1995 WL 476675 (N.D. Ill. 1995)............................................... 11

United Mine Workers v. Pennington, 381 U.S. 657 (1965)..................................8, 9

Wyoming Valley Bldg. Constr. Trades Council, 211 NLRB 1049 (1974).......41, 42

**Statutes**

26 U.S.C. § 501(c) ................................................................ 36

29 U.S.C. § 152(5) .......................................................2, 35, 37, 39, 43

29 U.S.C. § 158(b)(4)(ii)(B) ..............................................2, 3, 4

29 U.S.C. § 187 ..................................................................1, 2, 3

29 U.S.C. § 1291 ...................................................................... 1

Treas.Reg. § 1.501(c)(5)–1(a) ..............................................36, 37

Article 17-2-108 of the Anne Arundel County Code............................... 19

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................ 11

Fed. R. Civ. P.12(b)(6)…………………………………………………………11

## I.    Jurisdiction

29 U.S.C. § 187 provides subject matter jurisdiction in the United States District Court for the District of Maryland, as it states in pertinent part: "Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States…". This Court has appellate jurisdiction pursuant to 29 U.S.C. § 1291 as this is an appeal from the United States District Court for the District of Maryland's February 28, 2012 Order dismissing all but one of the Appellant's claims. The parties entered into a Consent Order dated March 29, 2012 (JA 67), whereby the Parties dismissed the remaining claim, rendering the February 28, 2012 Order a final order. The Appellants noted this timely appeal on April 2, 2012.

## II.    Statement of Issues Presented

1.    Whether the District Court erred in granting the Motions to Dismiss the First Amended Complaint (the "Complaint"), given the substantial support for the Plaintiffs' claim that the Defendant labor organizations had funded and directed sham litigation for the purpose of threatening, coercing and restraining Plaintiffs from doing business with Wegmans Food Markets, Inc. ("Wegmans"), a non-union supermarket chain, in violation of the secondary boycott provisions of the Labor Management Relations Act?

2.    Whether the District Court correctly dismissed the Complaint against

Defendant Mid-Atlantic Retail Food Industry Joint Labor Management Fund on the basis that it was not a labor organization as defined by 29 U.S.C. § 152(5)?

### III.    Statement of the Case

Plaintiffs Waugh Chapel South LLC, WCS LLC, and WCS Properties Business Trust, developers of the Village at Waugh Chapel South project ("Waugh Chapel South" or "the Project"), filed this action against the Defendants United Food and Commercial Workers Union Locals 27 and 400 (hereinafter the "UFCW Locals"), and the Defendant Mid-Atlantic Retail Food Industry Joint Labor Management Fund (the "Fund").  The Complaint alleged that the Defendants had engaged in secondary boycott activity as proscribed by 29 U.S.C. § 158(b)(4)(ii)(B), and were therefore liable to Plaintiffs as provided by 29 U.S.C. § 187.  The Plaintiffs alleged that the Defendants had filed, through surrogates, numerous sham lawsuits and administrative appeals designed to coerce Plaintiffs from engaging in business relationships with Wegmans, a non-union supermarket. All of these actions instituted by Defendants were either dismissed by the surrogate parties or were dismissed by the Circuit Court.

The Defendants filed Motions to Dismiss Plaintiffs' original Complaint and Supplemental Motions to Dismiss the First Amended Complaint, asserting, among various defenses, that the claims for relief were barred by the *Noerr-Pennington* doctrine. The Plaintiffs filed Oppositions to those Motions.  Without a hearing, the

2

District Court granted the Defendants' Motions to Dismiss, except as it related to one claim in Count II of the Complaint.[1]  The Parties then stipulated to a Consent Order dated March 29, 2012 (JA 67), whereby the remaining claim was dismissed, thereby rendering the Court's February 28, 2012 Order final.  This appeal was then timely noted.

## IV.   Statement of Facts

The Plaintiffs Waugh Chapel South LLC, WCS LLC, and WCS Properties Business Trust (the "Waugh Chapel Plaintiffs") are developers of the Waugh Chapel South development, a real estate project (the "Project") that will contain a supermarket operated by Wegmans Food Markets, Inc. ("Wegmans").   The Complaint alleged that the Defendant labor organizations, by directing and funding multiple legal actions designed to obstruct the Project, engaged in secondary boycott activity as proscribed by 29 U.S.C. § 158(b)(4)(ii)(B), and were therefore liable to Plaintiffs for damages as provided by 29 U.S.C. § 187.  JA 13-14.  The secondary boycott provisions of the Labor Management Relations Act provide that

---

[1] ELG Inglewood LLC ("ELG") owned an interest in the Woodmore Towne Centre development, a real estate project in Prince George's County, Maryland that includes a supermarket operated by Wegmans.   Two of the lawsuits and administrative actions directed by the Defendants pertained to the Woodmore development, and ELG Inglewood brought an action against the Defendants in Count Two of the Complaint.  JA 18-23.   The claims relating to one of those actions was dismissed by the March 29, 2012 Consent Order to allow for a final judgment.  ELG has decided not to proceed with its appeal of the District Court's dismissal of the remaining portion of Count II.

it is an unlawful labor practice for a labor organization or its agent "to threaten coerce, or restrain" a person with the objective of "forcing or requiring any person to …. cease doing business with any other person …"    29 U.S.C. § 158(b)(4)(ii)(B).  A labor organization engages in actionable secondary activities when (1) it threatens, coerces, or restrains a neutral party; (2) with the object of coercing that party to cease doing business with another; and (3) there is a causal connection between the violation and the harm suffered.  Del Turco v. Speedwell Design, 623 F.Supp.2d 319, 348 (E.D.N.Y. 2009). Economic coercion is sufficient. "The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own..." Taylor Milk Co. v. Int'l Bhd. of Teamsters, 248 F.3d 239, 244 (3rd Cir. 2001).

    The Complaint alleged that the Defendants engaged in concerted efforts designed to coerce Plaintiffs from developing projects that will include Wegmans supermarkets. JA 11.  Wegmans employs non-union labor.  Id.   At least as early as December 2005, the Defendant Local 27 was "setting its sights on Wegmans" in connection with an organizing campaign.  JA 14.      In 2007, aware that the Plaintiffs planned to include a Wegmans in Waugh Chapel South, the Executive Director of the Fund threatened Plaintiffs that if Wegmans did not unionize, "we will fight every project you develop where Wegmans is a tenant."  JA 18. Unsuccessful in their efforts to organize Wegmans, Defendants thereafter directed

and paid for numerous lawsuits and administrative challenges, conducted in the name of third parties, raising legal challenges to the Projects. JA 11. The sham litigation and administrative appeals were brought with the objective of interfering with Plaintiffs' business relationship with Wegmans, and demonstrating to the Plaintiffs and other developers that it would be far less expensive and risky to deal with supermarket chains that had collective bargaining agreements with the Defendant Locals. JA 14-15.

The Complaint alleged that the Defendants directed and paid for the prosecution of a series of overlapping, repetitive, baseless and sham lawsuits and appeals against Plaintiffs, filed by their surrogates, without regard to probable cause and regardless of the merits of such claims, for the express purpose of threatening, coercing, and restraining the Plaintiffs from engaging in business relationships with Wegmans and other non-union grocers. JA 15-16. The Defendants directed, participated in, and funded fourteen administrative appeals and lawsuits pertaining to the Waugh Chapel South development, which were described in the Complaint. Each of these matters was rejected by the applicable court or voluntarily dismissed by the Defendants' through their surrogates.[2] The

---

[2] As more fully set forth herein, the unsuccessful actions included two administrative appeals, two judicial challenges to administrative actions, a lawsuit which sought to enjoin the development, and nine appeals of separate grading and building permits issued for the Waugh Chapel South development by Anne Arundel County.

Complaint went on to allege the specifics of each of the administrative appeals and lawsuits directed by the Defendants, alleged that the Defendants funded and directed each, and further alleged that the Plaintiffs suffered substantial costs and expense in defending these matters.  JA 19-26.

## V.      Summary of Argument

The District Court erred in granting the Motion to Dismiss Count 1 of the Complaint.  The Complaint, and the public documents included in the record by the parties, adequately pled that the Defendants funded, directed, and controlled a series of sham administrative appeals and litigation designed to threaten and coerce Plaintiffs from engaging in and continuing their business relationship with Wegmans, in violation of the secondary boycott provisions of the National Labor Relations Act.  The Defendants asserted in their Motions to Dismiss that "the developers' claim for relief [was] barred by *Noerr-Pennington* immunity, which precludes liability for petitioning the government".  Defendants Locals 27 and 400 Motion to Dismiss, p. 1.[3]    As shown below, court actions or administrative challenges that are objectively baseless are considered sham and are not protected by *Noerr-Pennington*.  The Defendants attached to their Motion and Supplemental

---

[3] In their Motions to Dismiss, the Defendants also asserted that the Plaintiffs did not have a cognizable claim for damages, that the costs of litigation were not recoverable as damages, and that the complaint "defines a primary dispute, … not a secondary boycott." See Defendant Locals 27 and 400 Motion to Dismiss, pp. 1-5.  The District Court rejected those arguments.

Motions selective portions of the court and administrative filings at issue, in an attempt to demonstrate that the various administrative appeals and lawsuits were not baseless or sham.  In responding to the Motions, the Plaintiffs included portions of the record as well.  Without a hearing, the District Court dismissed Count I of the Complaint because it ruled that the Plaintiff had not stated a plausible claim that the fourteen dismissed lawsuits and administrative appeals pertaining to the Project were "baseless" or "sham" litigation.  JA 33-65. The District Court's analysis of the merits of the litigation and administrative appeals was superficial, and its dismissal necessarily rested upon a misapplication of the *Twombly* and *Iqbal* standard for consideration of a Motion to Dismiss.  It failed to consider substantial evidence that each of the proceedings initiated by the Defendants were nothing more than sham litigation.

The District Court also found that the Complaint failed to allege that the Fund was a labor organization, and held that it was therefore not liable for secondary boycott activity.  The Complaint adequately pled that the Fund was a labor organization, as it engaged in organizational activity, which the NLRB has recognized as the "*sine qua non* to negotiation of a collective bargaining agreement, and is within the broad term 'dealing with'" an employer as required by the relevant statute.

7

# VI. ARGUMENT

## 1. Standard of Review by this Court.

This Court reviews de novo a district court's order granting a motion to dismiss. <u>Smith v. Smith</u>, 589 F.3d 736, 738 (4th Cir. 2009); <u>Schatz v. Rosenberg</u>, 943 F.2d 485, 489 (4th Cir.1991).

## 2. The District Court erred in granting the Motions to Dismiss the First Amended Complaint given the substantial support for the Plaintiffs' claims that the Defendant labor organizations had funded and directed sham litigation as part of secondary boycott activity.

### a. Noerr-Pennington does not provide Defendants with immunity for the filing of multiple objectively baseless and sham litigation.

The ultimate issue for this appeal, construing the allegations in the Complaint and the public records incorporated in the pleadings in the light most favorable to Plaintiffs, is whether the District Court was correct that the Complaint failed to allege a plausible claim that any of the fourteen dismissed lawsuits and administrative actions were objectively baseless and sham, thereby depriving the Defendants of *Noerr-Pennington* immunity.

The *Noerr-Pennington* doctrine, grounded upon the First Amendment, was first recognized by the United States Supreme Court in <u>E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961) and <u>United Mine Workers v. Pennington</u>, 381 U.S. 657 (1965). In <u>Noerr</u>, the Court held that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence

the passage or enforcement of laws." Noerr, 365 U.S. at 135. Similarly, the Court wrote in Pennington that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." Pennington, 381 U.S. at 670. The Court later expanded on the doctrine in California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) stating that "the right to petition extends to all departments of the Government [and] [t]he right of access to the courts is indeed but one aspect of the right of petition." The doctrine was first applied in anti-trust cases. In Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731 (1983), the Supreme Court extended the *Noerr-Pennington* doctrine to cases arising in the labor law context.

The protection afforded by *Noerr-Pennington* is not plenary. The immunity does not apply to petitions or lawsuits that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144. In California Motor Transport the Court noted that a "pattern of baseless, repetitive claims" will abrogate First Amendment protections. California Motor Transp., 404 U.S. at 513.

In California Motor Transport, an antitrust case, the plaintiffs alleged that the defendants engaged in a conspiracy involving "a concerted action by [defendants] to institute state and federal proceedings to resist and defeat applications by [plaintiffs] to acquire operating rights or to transfer or register

9

those rights." Id. (emphasis added). They additionally argued that defendants "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases." Id. at 512. The Supreme Court found that these allegations came within the sham exception to the *Noerr-Pennington* doctrine. Id. at 516. Apropos to the present case, the Court stated that "[o]ne claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." Id.

Subsequently, the Supreme Court, in Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc., 508 U.S. 49 (1993) ("PRE"), established a two prong test to determine if a lawsuit fell within the sham exception to *Noerr-Pennington*. First, the lawsuit must be objectively baseless such that "no reasonable litigant could realistically expect success on the merits." Id. at 60. Second, if the challenged litigation is found to be objectively baseless, the court will examine the subjective intent of the party to determine if there was an attempt to interfere directly with the business relationship of a competitor. Id. at 60-61.[4] Quoting Otter Tail Power Co. v. United States, 410 U.S. 366, 380 (1973), the

---

[4] The Complaint clearly alleged the "subjective prong" for sham litigation, i.e., that the legal actions at issue were designed to obstruct Plaintiffs' business relationship with Wegmans. JA 14-16. Those allegations have not been challenged by Defendants, nor were they a basis for the District Court's decision to dismiss the Complaint.

10

Supreme Court noted that "[w]e have described a sham as 'evidenced by repetitive lawsuits carrying the hallmark of *insubstantial* claims.'" PRE, 508 U.S. at 58 (emphasis in original).

Application of the sham exception is ordinarily a question of fact. The Supreme Court noted that a *Noerr-Pennington* defense should be decided as a matter of law only "[w]here there is no dispute over the predicate facts of the underlying [petitions]." PRE, 508 U.S. at 60-61. See also Scooter Store, Inc. v. Spinlife.com, LLC, 2011 WL 1460438 (S.D. Ohio 2011); Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union, 593 F.Supp.2d 840, 844 (E.D. Va. 2008) (quoting Tizes v. Curcio, 1995 WL 476675, at *6 (N.D. Ill. 1995)); Morrone Co. v. Barbour, 241 F.Supp.2d 683, 690 (S.D. Miss. 2002); Kravco Co. v. Valley Forge Ctr. Assocs., 1992 WL 97926, at *3 (E.D. Pa. 1992); Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co., 760 F.2d 607, 612 n. 9 (5th Cir. 1985); Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, 690 F.2d 1240, 1253 (9th Cir. 1982).

**b. The Complaint will withstand a Motion to Dismiss if it presents a plausible claim for relief.**

Fed. R. Civ. P. 8(a)(2) requires that a pleading only contain "a short and plain statement showing that the pleader is entitled to relief". In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, (2007), the Supreme Court held that "while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations", more than "labels and conclusions" and "formulaic recitations of the elements of a cause of action" are required, and "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 556. To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id. at 570. The facts alleged must be sufficient "to raise a right to relief above the speculative level." Id. at 555. The Court noted, however, that "a well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556.

Obviously, the sufficiency of the allegations depends upon the specific cause of action pled. In Twombly, an anti-trust case, the issue was whether the allegations were sufficient to suggest that an agreement was made. Id. The Court found that the naked assertion of parallel conduct between the defendants was insufficient, "without that further circumstance pointing toward a meeting of the minds…". Id. at 557.

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Plaintiff filed an action pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), alleging that various federal officials had violated his constitutional rights because he was Muslim. The Court began by stating that "we begin by taking note of the elements" of the relevant cause of action, and noted that it was necessary, in order

to state a Bivens claim, that the Plaintiff allege that the Defendants acted with discriminatory purpose. Iqbal, 556 U.S. at 675, 677. Because the determination of whether a complaint states a plausible claim for relief is a "context-specific task", when considering a Motion to Dismiss, a lower court must identify pleadings which contain mere conclusions that must be supported by factual allegations. Id. at 679. The Court found that allegations that the Defendants "knew of, condoned, and willfully and maliciously agreed to subject" the defendant to harsh conditions of confinement because of his race were bare assertions that were devoid of factual allegations, and therefore did not "'nudg[e] [his] claims' of invidious discrimination 'across the line from conceivable to plausible'". Id. at 680 (quoting Twombly, 550 U.S. at 570). See also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009).

Neither Twombly nor Iqbal has changed the long standing rule that in considering a Motion to Dismiss, the Court will construe the Complaint's factual allegations in the light most favorable to the plaintiff. Smith, 589 F.3d at 738. Here, the relevant issue is whether the Plaintiffs adequately pled a plausible claim that any of the fourteen lawsuits and administrative appeals initiated, directed, and funded by the Defendants were "baseless" or "sham" litigation, thereby divesting Defendants of *Noerr-Pennington* immunity. The Defendants appended to their Motions to Dismiss various of the underlying pleadings and other administrative

13

records, and the Plaintiffs appended other such documents to their Oppositions. The District Court took judicial notice of this material, and in considering the Motions to Dismiss, was required to construe these public record documents in the light most favorable to the Plaintiffs. Brockington v. Boykins, 637 F.3d 503, 505 (4th Cir. 2011) (citing Papasan v. Allain, 478 U.S. 265, 283 (1986) ("We are bound for the purposes of this review to take the well-pleaded factual allegations in the complaint as true.…Construing these facts and relevant facts obtained from the public record in the light most favorable to the petitioners, we must ascertain whether they state a claim on which relief could be granted")).[5]

**c. The Plaintiffs alleged a plausible claim that each of the fourteen unsuccessful legal challenges and administrative appeals was objectively baseless and therefore stripped of *Noerr-Pennington* immunity.**

The District Court necessarily determined that the Plaintiffs had failed to allege a plausible claim that any of the unsuccessful litigation and administrative appeals directed by Defendants were objectively baseless. In so doing, it overlooked the allegations in the Complaint and the substantial facts that Plaintiffs provided, through public records, that these actions were indeed objectively

---

[5] It should not go without mention that the assertion of *Noerr-Pennington* is an affirmative defense. Igen Int'l v. Roche Diagnostics GmbH, 335 F.3d 303, 312 (4th Cir. 2003). This Court has noted that "asserting an affirmative defense….in a motion to dismiss presents a particular 'procedural stumbling block' for defendants." CSX Transp., Inc. v. Gilkison, 406 Fed. Appx. 723, 728 (4th Cir. 2010) (quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)).

baseless.  It deprived Plaintiffs of the ability to undertake discovery regarding the factual and legal predicate for these actions, as well as the ability to engage expert testimony to opine upon whether the claims had legal merit.  If left undisturbed, its opinion would require a standard of pleading for the sham exception to *Noerr-Pennington* that could never be met.

As shown below, at the very least, Plaintiffs have alleged a plausible claim, as required by <u>Twombly</u> and <u>Iqbal</u>, that each of the administrative appeals and lawsuits commenced at the Defendants' instigation was objectively baseless or sham litigation, when the pleadings and public records are appropriately analyzed in the light most favorable to Plaintiffs.

### 1.    The Motion To Rescind Zoning Filed August 21, 2008 was sham.

Development of the Waugh Chapel South Project required that the property be rezoned from residential to MXD-C, Mixed-Use Commercial.  On March 23, 2006, Anne Arundel County's Administrative Hearing Office approved the rezoning.  JA 19.  More than two years after the approval of rezoning, on August 21, 2008, George Murphy, Jr., by his counsel, G. Macy Nelson,[6] filed a "Motion to Rescind Zoning Pursuant to Section 18-16-404 of the Anne Arundel County

---

[6] The Defendants have utilized Mr. Nelson's services in order to file litigation, administrative appeals, and other challenges to development projects in Anne Arundel, Prince George's, and Howard County that will include supermarkets employing non-union labor.  JA 15.  Locals 27 and 400 paid Nelson more than $385,000 during 2007-2010 for those services. JA 596.

Code". Id. Mr. Murphy was then Secretary-Treasurer Defendant Local 27. Id. Mr. Murphy's standing was challenged, and other individuals were added as movants. Id.

The Motion to Rescind Zoning alleged that the property owner at the time of the request had failed to disclose to the hearing officer who approved the rezoning that monitoring wells on the property had detected constituents of coal combustion byproducts ("CCBs" or "ash") in groundwater on the site. JA 385. The Plaintiffs herein filed an extensive Response. JA 383-432. The Response asserted that the Motion to Rescind was "without factual or legal basis". JA 383. It set forth evidence that the Movants could never have met the applicable legal standard to rescind the zoning, given that environmental impact is not relevant to the request for a zoning change, and thus there was no duty to disclose environmental information. JA 398. Further, the Response demonstrated that the owner of the property had in any event disclosed to the hearing officer the existence of ash on the property, JA 399, and that there was evidence in the public record and before the hearing examiner in another matter regarding ground water contamination at the site. JA 402. Also, there was substantial evidence that none of the Movants were "aggrieved parties" as required for standing,[7] because none had attended the initial zoning hearing, although some had alleged to the contrary. JA 411-12.

---

[7] Sugerloaf Citizens Assn. v. Dept. of the Env't, 344 Md. 271, 288-89, 686 A.2d 605, 614-15 (1996).

Finally, the Response asserted that none of the Movants met the standard necessary to demonstrate that they resided in an area close enough to be impacted by the rezoning, and included evidence that two of the Movants, one of whom was Murphy, falsely listed their home addresses in the Motion to Rescind. JA 426-28.

The Motion to Rescind was pending for months, and the Plaintiffs were forced to incur substantial legal fees to defend the rezoning. The day before the November 19, 2008 scheduled hearing on the merits, the Motion to Rescind was voluntarily dismissed by the Movants, on the basis that it "did not make economic sense to litigate [an] issue" of whether "only a party to the original rezoning case ... may petition to rescind the zoning." JA 441. This eleventh hour voluntary dismissal was the first of several other last minute dismissals directed by Defendants.

The fact that the case was voluntarily dismissed on the day prior to the hearing raises significant issues, in and of itself, as to whether it was baseless. The facts regarding the lack of standing, which was the purported basis for the voluntary dismissal, were known at the inception of the case. The legal consequences of those facts, impacting a fundamental issue in the case, should have been researched before the Motion to Rescind was filed. Viewing the Response in the light most favorable to the Plaintiffs, as well as the purported justification for the voluntary dismissal, it is clearly plausible that the Motion to

17

Rescind, brought two years after the approval of rezoning, was objectively baseless and a sham.

In holding that the Plaintiffs had failed to sufficiently allege that the Motion to Rescind was a baseless proceeding, the District Court failed to view the underlying pleadings in the light most favorable to the Plaintiffs. Without analyzing the merits of the Motion, the District Court assumed that the dismissal was to avoid disclosure of the Locals' financial records in response to a subpoena, records that would have demonstrated the Defendants involvement in the funding and direction of the litigation. JA 57. The voluntary dismissal does not, in and of itself, demonstrate that the action was objectively baseless. However, given the other indicia of baselessness, a plausible inference is that the last minute dismissal was due to the recognition that the case could never have been litigated successfully, and was filed as part of Defendants' attempt to increase the risk and cost of the Project. JA 11. The Plaintiffs were entitled to that inference in the Court's consideration of the Motions to Dismiss. Under the appropriate *Twombly* and *Iqbal* standard, the Plaintiffs certainly carried their burden of alleging facts demonstrating that it was at least plausible that the Motion to Rescind was objectively baseless, and accordingly divested of *Noerr-Pennington* immunity.

**2.     The December 3, 2009 Challenge To The Request For Extension Of Security For The Public Works Agreement was sham.**

On July 16, 2009, Plaintiff WCS LLC requested an extension under the

County Code to pay certain fees and post certain bonds in connection with the Public Works Agreement. The County approved a modification extending the time requirement to post the security on July 24, 2009, and a second modification on November 5, 2009. JA 20.

On December 3, 2009, Paul and Tracee Gilliam and the Patuxent Riverkeeper, represented by Mr. Nelson, filed an appeal of the Office of Planning and Zoning's grant of the second extension. JA 20-21, 442. The Notice of Appeal form attached a copy of the November 5, 2009 letter from the Anne Arundel County Office of Planning and Zoning approving the modification. JA 444. As noted by the Office of Planning and Zoning, "the request is consistent with the criteria noted in…Article 17-2-108…". Id. Indeed, Article 17-2-108 of the Anne Arundel County Code provides that the "Planning and Zoning Officer may approve an application for a modification to any provision of this article," with exceptions not pertinent here. JA 484-85. The Notice of Appeal form requires that the Appellant "provide a brief statement for the reason for the appeal". JA 442. The "reason" provided by the Appellants was that the Office of Planning and Zoning had "erred". JA 442-443. No other basis for the appeal was provided.

There is no indication in the record that there was any objective basis for the appeal or any probability of success. The Anne Arundel County Code allowed for exactly the modification as provided of the County, and the specific section was

cited in the County's letter approving the modification. The appeal, once again, was dismissed on the date of the scheduled hearing. Viewed in the light most favorable to Plaintiffs, it is at the very least plausible that the appeal was objectively baseless and a sham. The dismissal of the appeal once again reflects that the action was so lacking in merit that the Appellants had no choice but to abandon their case.[8]

### 3.    March 7, 2010 Litigation Regarding Tax Increment Financing was sham.

Pursuant to the Anne Arundel County Code, the County Council may issue bonds to finance, in whole, or in part, infrastructure improvements for land developments. JA 21. As part of the Tax Incremental Financing ("TIF") process, on March 15, 2010, after a public hearing, the County Council adopted Resolution No. 13-10, and Bills No. 9-10, and 10-10, which provided for TIF financing, and which were later signed by the County Executive. Id. The TIF financing allowed the County to issue bonds to finance public improvements for the Project. Id.

Recognizing that the TIF was crucial for Waugh Chapel South's financing, on March 17, 2010, the Defendants funded and directed the filing of a Declaratory Judgment action in the Circuit Court for Anne Arundel County against the Anne

---

[8] Citing ¶37 of the Amended Complaint, the District Court stated that the Plaintiffs alleged that the appeal was withdrawn once it became moot. That was not the Plaintiffs' contention, nor was it alleged in the First Amended Complaint. Plaintiffs' Opposition to the Locals' 27 and 400 Motions to Dismiss, at pp. 36-37, sets forth Plaintiffs' position that the appeal was objectively baseless.

Arundel County Council and County Executive, challenging the County's implementation of the legislation authorizing the TIF.  Id.  The lawsuit, filed by Plaintiffs Robert Smith and Madonna Brennan, represented by Mr. Nelson, sought declaratory and preliminary injunctive relief preventing the TIF financing, alleging that the County had failed to publish in a newspaper of general circulation the title or a summary of Bill No. 10-10.  JA 275-283.  The Plaintiffs sought a declaration that the Resolution and Bills "are invalid and cannot be repealed and reintroduced."  JA 281.  Count II sought a Preliminary Injunction "order[ing] that the defendants are prohibited from implementing the Bill" that would authorize the TIF financing.  JA 282.  Anne Arundel County republished notification of the Bill and Resolutions, which were signed into law by the County Executive.  The litigation was voluntarily dismissed by Nelson on the date of the scheduled hearing.  JA 21-22.

The District Court found that the litigation was successful because the County reenacted the legislation.  JA 55.  This is incorrect.  The relief sought was not the reenactment of the legislation, but a declaration that the Resolution and Bills could not be reenacted, that they were "invalid and [could not] be repealed and reintroduced."  JA 281.  Given that there was no legal basis to assert that the legislation enacting the TIF could not be reintroduced, and that therefore the declaration and the preliminary injunction sought could never have been issued, it

21

is at least plausible that the litigation was objectively baseless, and once again the voluntary dismissal, on the date of the scheduled hearing, was a recognition that the relief pled could never be achieved.

**Litigation Involving Alleged Environmental Issues**

The Defendants funded a series of lawsuits and administrative challenges in their attempt to derail the Waugh Chapel South project under the guise of environmental concerns.   The litigation was summarily dismissed by two judges of the Circuit Court for Anne Arundel County.  Unperturbed, the Defendants then caused the same issues to be raised in appeals of zoning and building permits issued for the Project, which they later voluntarily dismissed after the Plaintiffs filed a Motion to Dismiss their appeals.

**4.     The July 1, 2010 And August 28, 2010 Challenges To MDE's Renewal Of Mining Permit was sham.**

On July 1, 2010, Robert Smith and the "Patuxent Riverkeeper", again represented by Mr. Nelson, filed a Petition for Judicial Review of MDE's renewal of a Surface Mining Permit ("Permit") for the site (hereinafter "Mining Permit Petition").   JA 23.  As part of infrastructure grading, the Plaintiffs had to excavate coal ash, and then replace the ash elsewhere within the site's existing ash footprint. The Petition for Judicial Review sought to overturn the renewal of the Permit, prevent the movement of the ash on the site, and thus delay the Project.  Id.

Together with the Petition, the Petitioners filed a Motion to Stay, seeking to stay

the issuance of the Permit until a trial on the merits.  JA 285.  The Motion to Stay

was heard by the Circuit Court on August 10, 2010.  At the hearing, the Petitioners

produced affidavits from Robert Smith and Michael Davie, the latter purportedly a

"contributing supporter" of The Patuxent Riverkeeper.  JA 448-54.   Smith averred

that he resided at 1475 Chatham Court, approximately 2000 feet southeast of the

Site, that his property was served by public water, and that "contaminated

groundwater flows in a southeasterly direction from the Mining Operation directly

towards my property and public drinking wells."  JA 449.  Smith went on to state:

> 7.    MDE's decision to renew the mining permit releases
> approximately 50 acres of land from the permit.   It is my
> understanding that the renewal has the effect of authorizing the
> permittee to excavate and then redeposit large quantities of fly ash.
>
> 8.    I am familiar with and stay abreast of property values in
> my neighborhood.  In my opinion, reasonable people, including me,
> want to live where there is no risk of environmental contamination.  I
> believe that the opening of the reclaimed mine, the exposure of the fly
> ash, and the excavation and redepositing of large quantities of fly ash
> will worsen the ground water contamination and will make it more
> difficult to remediate the contamination.   In my opinion, MDE's
> decision to renew the mining permit will impair the value of my
> property.

JA 451.   Davie's affidavit was essentially identical in that regard, also indicating

his "belief" that the movement of CCBs "will worsen the ground water

contamination."  JA 453.

By written opinion dated September 3, 2010, Judge Philip Caroom, of the

Circuit Court for Anne Arundel County, not only denied the Motion to Stay, but

23

also dismissed the Mining Permit Petition.   JA 193-200.   He found that the

Petitioners' claims were "based in critical part only on conjecture."   The Court

stated:

> As to the first point, the Court finds that Plaintiffs' two affidavits allege injuries relating to pre-existing aquifer pollution, already governed by the 2007 Consent Order, and simply conjecture that a revision to the current reclamation plan adversely will impact them....
>
> Neither Smith nor Davie have been identified as an environmental expert of any kind. *Neither has offered any explanation, other than their speculation ("I believe...") , as to why the existing remediation plans provided by the 2007 Consent Order and the currently required environmental safeguards.* The current, extensive safeguards – all of which would remain in effect under the renewal permit – include use of a larger "pump and treat" groundwater recovery system, "enhanced cap inspection activities to ensure timely identification and correction of site erosion and stormwater management issues," .....

JA 196-197 (emphasis supplied).

Smith's assertion that "contaminated groundwater" flowed toward his home

(served by public water) was simply concocted.   There is a recovery well system in

place between the development site (the "Site") and Smith's property.   The system

captures groundwater flowing down gradient from the Site, treats the groundwater

to remove ash constituents, and then releases the treated water.   JA 197.   No

support was offered, other than Mr. Smith's and Mr. Davie's conjecture, that the

relocation of ash within the Project's ash footprint would make remediation more

difficult.

Although Judge Caroom dismissed the Petition, he addressed the Motion to

24

Stay in the event of appellate review. In what will become a pattern, the Court

found that the Petition, brought in the name of environmental concern, was in fact

against the public interest because its true motivation was to prevent the

remediation process from going forward:

> The likelihood that Petitioners will succeed on the merits is low,
> because Petitioners will not suffer irreparable harm from the permit
> renewal, since the permit renewal per se does not effect the
> remediation required by the 2007 Consent Order, which is Petitioners'
> underlying concern. *The balance of convenience demonstrates*
> *greater immediate harm to Defendant BBSS, since halting*
> *reclamation and development could cause loss of development*
> *financing and momentum in the reclamation process. The best*
> *interest of the public would allow the reclamation process to move*
> *forward because the enforcement of the consent decree as to this*
> *disputed area may continue unaffected by the permit renewal.*
> *Therefore, this Court denies the Petitioners motion to stay.*

JA 199-200.[9] (Emphasis supplied).

Judge Caroom also noted that the remediation of the site was the subject of a

2007 Consent Order enforced by MDE. JA 197, n.2. He noted that while the

Petitioners disputed the adequacy of MDE's enforcement, the Petition constituted

"an indirect motion to intervene [in the Consent Order action] without an

---

[9] MDE reissued a corrected Permit on July 28, 2010, merely correcting the name of
the Permit, making clear that it was merely a renewal and not a modification of the
existing Permit. The same parties filed a Petition for Judicial Review with regard
to that renewal, but voluntarily dismissed it upon the Court's ruling in the first
Permit challenge. Although agreeing to dismiss the second Petition, the Petitioners
then appealed the dismissal, and also appealed the Court's dismissal of the first
permit. Those matters are now pending before the Court of Special Appeals of
Maryland. JA 24.

accompanying motion to consolidate as to the separate, existing, ongoing enforcement action".  Id.

It is certainly plausible that the Petition for Judicial Review was objectively baseless.  There was a judicial finding that there was no factual support for the claim other than conjecture.  Legally, the appeal was nothing more than an attack on a Consent Decree pertaining to the property which was being enforced by MDE, and to which, as noted by the Court, the Petitioners were not a party.   The sham nature of the litigation is evidenced by the fact that on one hand, the Petitioners expressed concern regarding ground water contamination impacting their residence, but on the other hand, in the words of the Circuit Court, the relief sought would result in the loss in momentum in the reclamation of any such contamination.[10]

---

[10] The District Court, in determining that the requisite pleading of baselessness had not been met, stated that "the appeal was stayed pending the Court of Appeals decision on the Riverkeeper's standing in [Patuxent Riverkeeper v. Maryland Department of the Environment, 422 Md. 294, 29 A.3d 584 (2011)] … and is now ripe for state court review".  JA 56.  The case referenced by the District Court related to the Riverkeeper's standing on appeal in a different matter not concerning the Waugh Chapel South Project, or the Mining Permit challenge, and involved totally different facts.  The appeal of the Mining Permit was not in fact stayed pending the decision by the Court of Appeals in the Woodmore matter.  While Smith and the Patuxent Riverkeeper's appeal of the Mining Permit matter has not yet been decided, Judge Caroom's decision provides ample support that the Petition was baseless.

5.      **The June 28, 2010 "Injunctive Action" was sham.**

On June 28, 2010, Robert Smith, again represented by Mr. Nelson, instituted litigation in the Circuit Court of Anne Arundel County against Greenberg Gibbons Commercial Corporation ("Greenberg Gibbons")[11], Constellation Power Source Generation, Inc. ("Constellation"), BBSS, Inc., the Maryland Department of the Environment ("MDE"), the Anne Arundel County Council, Anne Arundel County Office of Planning and Zoning, and the Anne Arundel County Department of Inspections and Permits (hereinafter the "Injunctive Action").  The Patuxent Riverkeeper was later added as a Plaintiff.  JA 321-52.

The Complaint sought to halt development of Waugh Chapel South.  It alleged that MDE had not appropriately enforced an October 1, 2007 Consent Decree, and that MDE's lack of enforcement, and Constellation and BBSS's lack of compliance, created a nuisance adversely impacting Smith's property.   JA 337-39.  Smith alleged that "activities on the Subject Property have contributed to significant groundwater contamination, have negatively impacted the value of private property in the vicinity of the Subject Property, and threaten public safety and the general welfare."  JA 340-41.[12]   Among other relief, it sought a writ of

---

[11] Greenberg Gibbons is the development partner for the Waugh Chapel South project. JA 255.

[12] These allegations were made in the original Complaint, filed before Judge Caroom's ruling, and were maintained in the Amended Complaint, despite Judge

27

mandamus against MDE to require it to enforce the Consent Decree, JA 337, and a preliminary and permanent injunction preventing Greenberg Gibbons from further development of the Project until the alleged nuisance had been abated. JA 343-44. It further sought to enjoin implementation of TIF financing, JA 349, (although the prior administrative appeal had been dismissed), to "prevent or delay" Anne Arundel County from issuing additional permits for development, JA 348, and to "delay or enjoin" MDE from renewing the Mining Permit, although a separate Petition for Judicial Review had been filed regarding the Permit. JA 346.

Greenberg Gibbons, BBSS, and Anne Arundel County filed Motions to Dismiss the Complaint at the inception of the litigation. As the Motions were not ruled upon, discovery was taken, and all parties filed Motions for Summary Judgment. JA 254-74. On May 17, 2011, Circuit Court Judge Ronald Silkworth granted the Motions to Dismiss, and dismissed the Amended Complaint. Among other things, Judge Silkworth found (as Judge Caroom had earlier) that although the Complaint was brought under the pretext of an environment concern, the relief requested would adversely impact remediation of the site, and that Smith and the Patuxent Riverkeeper had failed to produce even a modicum of evidence to support their claims:

> Here, the mining and reclamation activities are legitimate, such that an

---

Caroom's ruling that there was no support for the allegations. As shown below, Judge Silkworth of Anne Arundel County reached the same conclusion.

injunction should be issued only if the circumstances *plainly* show that the activity will be conducted as a nuisance. *See Leatherbury*, 276 Md. at 377. In the present case, even accepting Plaintiffs' expert testimony that there is a risk of future ground water contamination, this does not warrant the issuance of an injunction based on nuisance because the conduct – mining and reclamation – does not constitute a nuisance per se. *In fact the activity is being conducted to prevent a nuisance, pursuant to the 2007 Consent Decree. Thus, the Court agrees with the Defendants that to issue an injunction of mining and reclamation activities is contrary to the asserted desire of Plaintiff's that the Consent Decree be enforced.* Based on the totality of evidence, even when taken in the light most favorable to Plaintiffs, the Court finds that an injunction is inappropriate in this case. Rather, MDE should continue to exercise its special expertise and continue to enforce the Consent Decree entered into with BBSS and Constellation.

Similarly, the Court does not find that the issuance of an injunction is appropriate with respect to site development being conducted by Greenberg Gibbons. Even in the light most favorable to Plaintiffs, *there is insufficient evidence to show that any alleged nuisance has been created or exacerbated by development of the site.* Further, the construction does not constitute a nuisance per se. Thus, an injunction of an anticipatory nuisance is inappropriate. The Court also notes that any effect that the development is having on the enforcement of the Consent Decree is being monitored by MDE. Again, the Court does not find that it should substitute its judgment for the judgment of MDE, which has been consistently involved in monitoring this site. Therefore, Counts IV and V of the Amended Complaint are dismissed without prejudice.

See JA 266-67 (emphasis added).

Mr. Smith and the Patuxent Riverkeeper's challenge to MDE's renewal of the mining permit was dismissed by Judge Caroom on September 3, 2010 on the basis that allegations of groundwater contamination were "simply conjecture." Nevertheless, the Defendants funded and directed the Injunctive Action for the

next eight months, at substantial cost to Plaintiffs, which was then dismissed by Judge Silkworth, in part because there "was insufficient evidence to show that any alleged nuisance has been created or exacerbated by development of the site."

The other claims brought by Plaintiffs that would have thwarted the ongoing development were also found to be without merit, and dismissed. The Court found that the claim for mandamus to require MDE to enforce the Consent Decree was inappropriate because mandamus applies only to ministerial acts, and MDE's enforcement of the Consent Decree was clearly not ministerial. JA 259-60. It also found that the nuisance claim was merely a request that the Court substitute its judgment for MDE, JA 264, that the attempt to enjoin various administrative actions that had already been taken, such as the issuance of the Mining Permit and TIF, were moot, and the attempt to enjoin the issuance of future land development permits constituted an attempt to do an "end run" around the administrative process. JA 268-69. These rulings underscore that it is at least plausible that the litigation lacked objective merit. While Mr. Nelson, on behalf of his clients, filed an appeal of Judge Silkworth's ruling, the appeals against Greenberg Gibbons, Anne Arundel County, and MDE were then dismissed. JA 1029.[13]

---

[13] Citing Balt. Scrap Corp. v. David J. Joseph Co., 237 F.3d 394 400 (4th Cir. 2001), the District Court ruled that because the Circuit Court noted that some of the issues were complicated, and did not summarily reject any of the claims, it resolved the litigation after thoughtful consideration, and therefore the litigation was not objectively baseless. JA 58. The claims were summarily rejected, as they

**6.    The appeals of Building and Grading Permits were sham.**

From May to June 2011, Robert Smith and Sandra Bowie, represented by Mr. Nelson, filed appeals of four grading and five building permits issued by Anne Arundel County to the Plaintiffs.  JA 24-25 at ¶44.  The Defendants directed and funded these appeals.  JA 26.  The four grading permit appeals were filed on May 26, 2011, only nine days after Judge Silkworth's dismissal of the Injunctive Action, where he specifically found that "even in the light most favorable to the Plaintiffs, there is insufficient evidence to show that any alleged nuisance [resulting from alleged groundwater contamination] has been created or exacerbated by development of the site."  JA 266-67.  Nevertheless, Smith and Bowie alleged that "development of the subject property …. prior to a complete understanding of the existing groundwater contamination at the site will prevent proper remediation and prevention of future contaminants".  JA 465-80.  Each appeal also alleged, in nothing more than a summary fashion, that the applicable grading permits failed to meet the criteria set forth in the Anne Arundel County

---

were dismissed on motions to dismiss.  The District Court provided no analysis to support its conclusion that the litigation was not baseless, and clearly the record provides support for the proposition that the factual contentions and the legal theories asserted were wholly without merit.  This case is clearly different than Balt. Scrap, as there, two Circuit Court judges had sustained the Plaintiffs' claims, only to be reversed on appeal.   In any event, the test utilized by the District Court, that litigation is sham only if "summarily rejected" or dismissed "without thoughtful consideration", would be an impossible one to apply.

Code for the issuance of permits, as well as other alleged violations of the Code. See e.g., JA 468.

Smith and Bowie, joined by Rosie Shorter, also appealed five building permits issued by Anne Arundel County, again represented by Nelson.   These appeals were filed in late June and early July 2011.  While each of the appeals contained identical groundwater contamination contentions, they also each alleged, in summary fashion only, violations of the International Building Code, the Anne Arundel County Construction and Maintenance Code, and various other County policies.  JA 541-70.   Plaintiff WCS Properties filed a lengthy motion to dismiss the grading and building permit appeals.  JA 920-1021.  The motion to dismiss the appeals raised substantial issues as to whether the appellants had any standing to appeal, i.e., whether they were "aggrieved" because of the distance and physical obstructions between their property and the Waugh Chapel South development. JA 926-27.  Further, the motion asserted that collateral estoppel barred Smith from again raising ground water contamination issues, given Judge Silkworth's ruling, only weeks earlier, that he had failed to demonstrate the factual predicate for a claim of nuisance regarding groundwater after a year of litigation, and that Bowie and Shorter were also barred because although they were not parties to the

Injunctive Action, both the Injunctive Action and the permit appeals were controlled by the Defendants.[14]  JA 931-43.

In support of its claim that the "groundwater contamination" issues were barred by collateral estoppel and that the Defendants controlled the Injunctive Action and the permit appeals, the Plaintiff WCS Properties obtained subpoenas from the Board of Appeals directed to the Defendants' custodian of records, to require the production of documents demonstrating that the Defendants were controlling the appeals and providing payment of counsel fees.   Almost immediately after service of the first subpoena, the Appellants dismissed all of the appeals.  JA 25-26.   The Plaintiff WCS Properties incurred tens of thousands of dollars in defending the sham appeals.  Id.[15]

Smith and Bowie chose not to even respond to the motion to dismiss, instead dismissing their appeals.  It is at least a fair inference that they dismissed these appeals because they could not successfully respond.  The claim that the permits should have been denied because of groundwater contamination, made only days

---

[14] The Court of Appeals of Maryland recently reaffirmed that when the interests of a non-party to a lawsuit are adequately represented, the non-party to the original suit is barred by res judicata from bringing a new suit, where the claims are intertwined with the claims adjudicated in the previous litigation.  See Cochran v. Griffith Energy Servs., Inc., No. 87, 2012 WL 1499817 (Md. May 1, 2012).

[15] In that regard, it is useful to note that while the cost to file the grading and building permit appeals was minimal, as evidenced by the conclusory allegations in the appeals, (see e.g., JA 541-43),  the cost to defend these appeals, however, was substantial.  JA 26.

after an identical claim was dismissed by Judge Silkworth because there was insufficient evidence to support it, demonstrates on its face plausibility that the appeal was objectively baseless.

The District Court did not address whether the building and grading permit appeals were objectively baseless, instead assuming that they were dismissed to avoid compliance with subpoenas issued to the Defendant Locals and the Fund, and then noting that the voluntary dismissal of these appeals only suggest improper subjective intent.  JA 57.  While as the District Court recognized, "an ultimately unsuccessful action is not necessarily baseless", JA 57, there is substantial evidence that the appeals lacked both factual and legal merit, and the voluntary dismissal of these administrative appeals, when confronted with a Motion to Dismiss, is evidence that were objectively baseless.   At this stage of the proceeding, viewed in the light most favorable to Plaintiffs, a reasonable and plausible presumption is that the arguments in the Motion to Dismiss were valid and the appeals lacked merit.

As noted above, the application of the sham exception to Noerr-Pennington is ordinarily a question of fact.  The Plaintiffs demonstrated that their claim of sham litigation with regard to the fourteen dismissed lawsuits and administrative appeals was, at the very least, plausible.  The District Court's dismissal of Count I of the First Amended Complaint was thus error.

34

**3.    The Complaint adequately pleads that the Fund is a labor organization.**

The District Court held, as a matter of law, that the Fund was not a labor organization as defined by 29 U.S.C. § 152(5), and was therefore not subject to liability for secondary boycott activity as provided pursuant to 29 U.S.C. § 158(b)(4)(ii).  JA 65.

29 U.S.C. § 152(5) defines a labor organization as

…any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

The Complaint alleged that the Fund was a labor organization as defined by § 152(5).  JA 13.  The Trustees of the Fund were representatives of Defendants UFCW Locals 27 and 400, Safeway, Inc., and Giant Food, Inc.  JA 12.  The Fund engaged in organization activities with regard to Wegmans.  JA 13.  The issue once again is whether the allegation that the Fund is a labor organization is plausible, viewing the allegations in the Complaint and the applicable exhibits to Plaintiffs' Opposition to the Fund's Motion to Dismiss in the light most favorable to the Plaintiffs.

Public documents that Plaintiffs produced in Opposition to the Fund's Motion to Dismiss indicate that for purposes of seeking tax exempt status, the Fund itself represented that it is a labor organization.    The Fund purports to be a

35

charitable organization established by UFCW Locals 27 and 400, and the Food

Employers Labor Relations Association.  JA 12.  In connection with its tax exempt

status, the Fund's tax returns indicate it is a 501(c)(5) tax exempt organization.  26

U.S.C.  §  501(c)  lists  those  organizations  that  may  be  tax  exempt.    Section

501(c)(5) specify "labor, agricultural, or horticultural organizations".  Each of the

Fund's returns defines its primary exempt purpose as follows:

> Improving  labor-management  relations,  improving  job  security,
> improving  organizational  effectiveness  in  the  retail  industry,
> enhancing  economic  development  and  monitoring  the  conditions  of
> those engaged in the retail food industry.

> The returns describe "their exempt purpose achievements" as follows:

> Public  relations  and  promotion  of  the  collectively  bargained
> industries. Continued a comprehensive, long-term program to promote
> union labor, enhance the market share of contractors signatory to
> Local  Unions  27  and  400,  and  attract  new  union  members,
> contractors,  and  customers,  and  improve  labor-management
> relationships in the retail food industry.

 JA 499-526.

While Title 29 does not define "labor organization", IRS regulations provide

the following definition for those organizations that are tax exempt pursuant to

501(c)(5):

> The organizations contemplated by section 501(c)(5) as entitled to
> exemption from income taxation are those which:

> (1) Have no net earnings inuring to the benefit of any member, and

(2) Have as their objects the betterment of conditions of those engaged in such pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their respective occupations.

Treas.Reg. § 1.501(c)(5)–1(a).

The definition is obviously sufficiently vague to encompass agricultural, horticultural, and labor organizations.  However, just as the IRS's definition of a tax-exempt organization requires that the entity have as its objective "the betterment of conditions of those engaged in such pursuits", the definition of a labor organization contained in 29 U.S.C. § 152(5) includes an entity established to deal with employers in connection with "wages, rates of pay, hours of employment, or conditions of work".

As alleged in the Complaint, in October 2001, the Fund submitted an application to the Internal Revenue Service for tax exempt status.  The Fund described its activities as follows:

> The Fund is a Joint Management Committee as defined by Section 302(c)(9) of the Labor Management Relations Act.  Purposes and objectives of the Fund may include improving labor-management relationships, improving job security, improving organizational effectiveness, enhancing economic development and monitoring the conditions of employees engaged in the retail food industry.  The Fund's activities are limited to government petitioning activity, which may include petitioning federal, state and /or local legislative, executive, quasi-judicial (regulatory) and/or judicial authorities.  All such governmental petitioning activity will be conducted for the purposes and objectives described above.

JA 13.

37

Attached to the Form 1024 was the Fund's Agreement and Declaration of

Trust.  Section 1(b), Article V of the document states as follows:

> The Board of Trustees power and authority shall be discharged solely
> for the purposes that are consistent with engaging in Government
> Petitioning Activity.  The Trustees are expressly prohibited from
> authorizing, ratifying, or participating directly or indirectly in any
> picketing, boycotting or other union … collective activities.

JA 13.

Although indicating that its activities were limited to government petitioning

activity, the Fund engaged in organizational activities with regard to Wegmans, as

indicated by its participation in secondary boycott activity, contrary to its

Application for Tax Exempt Status submitted to the Internal Revenue Service and

its Agreement and Declaration of Trust.  JA 13.  In 2007, the Fund's Executive

Director, Torrey Jacobsen, upon learning that the Waugh Chapel South Project

would include a Wegmans supermarket, telephoned Brian Gibbons, the president

of Greenberg Gibbons Commercial Corporation, Plaintiffs' lead development

partner, and asked Gibbons for a contact at Wegmans so that Jacobsen could

discuss unionization.  When Gibbons asked Jacobsen why he was not contacting

Wegmans directly, Jacobsen stated that if Wegmans was not unionized, the Fund

would fight every project that Greenberg Gibbons developed that included a

Wegmans.  JA 18.  Subsequently, the Locals and the Fund engaged in a campaign

of filing numerous sham lawsuits and administrative appeals, with the purpose of

coercing and threatening Plaintiffs in an attempt to interfere with their contractual relationships with Wegmans.[16]  JA 11.  These actions constituted organizational activities with regard to Wegmans, albeit those proscribed by the secondary boycott provisions of the National Labor Relations Act.  JA 13.

For purposes of 29 U.S.C. § 152(5), a labor organization must "exist for the purpose, in whole or in part, of dealing with an employer" over matters affecting employment.  NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1270, n. 6 (4th Cir. 1994).  There is evidence that one of the Fund's objectives was to conduct organizing activity as a prelude to collective bargaining, a hallmark of a labor organization, as its returns reflect that the Fund's achievements included the continuation of "a comprehensive, long-term program to promote union labor, enhance the market share of contractors signatory to Local Unions 27 and 400, and attract new union members…".  See, e.g., JA 501.  The Complaint alleges that the Fund, through its Executive Director, was involved in organizational activity, as Mr. Jacobsen sought from Mr. Gibbons a contact at Wegmans to discuss unionization.  Obviously unsuccessful, the Fund then proceeded to participate in

---

[16] Although the Plaintiffs have not been afforded the opportunity to conduct discovery in this matter, with regard to the Injunctive Action alleged in the Complaint at ¶36, at least two of the experts supposedly retained by Robert Smith and the Patuxent Riverkeeper never spoke to either of them, but instead spoke to Mr. Jacobsen, regarding their opinions.  JA 487-98.

the secondary boycott activity alleged in the Complaint ultimately aimed at Wegmans.

The NLRB's decision in <u>Bldg. & Constr. Trades Council of Reading & Berks Cnty.</u>, 155 NLRB 1184, 1186 (1965) is particularly relevant, as the NLRB found that the Building & Construction Trades Council of Reading & Berks County (the "Council"), which had engaged in secondary boycott activity, was a labor organization under § 152(5), as it dealt with employers through organizational activity.  The Council was a building trade counsel comprised of members of nineteen constituent locals of the AFL-CIO.  The NLRB found that the Council had engaged in illegal secondary boycott activity by picketing a general contractor with the objective of forcing that general contractor to cease doing business with a non-unionized subcontractor.  <u>Id.</u> at 1189-90.  As stated by the Trial Examiner and adopted by the Board, "the Council's above-described conduct had as an object forcing General [the general contractor] to cease doing business with Kulp [the non-unionized subcontractor] and that the unlawful object was reflected in the picketing." <u>Id.</u> at 1189-90.

The Council denied that it was a labor organization, and thus not subject to the proscription on secondary boycott activity.  In denying that it was a labor organization, the Council contended:

> …that it has no employee membership, as such, but is comprised of delegates selected by its 19 constituent and autonomous union

40

> affiliates, and that it does not negotiate with employers and does not enter into agreements with them concerning wages, hours and conditions of employment.

Id. at 1186.

The NLRB squarely rejected the Council's claim, and held that the Council was a labor organization under § 152(5), stating:

> [O]ne of the Council's functions is to organize employees of nonunion contractors for its constituent locals…; organizational activity, if successful, would in the normal course result in recognition of its constituent local or locals; and as recognition is the *sine qua non* to negotiation of a collective bargaining agreement and is within the broad term 'dealing with' in Section 2(5) of the Act, I find that [the Council] is a labor organization within the meaning of [Section 2(5)].

Id. at 1186-87.

Later, the Board reached the same result in Wyoming Valley Bldg. Constr. Trades Council, 211 NLRB 1049 (1974). There, the Respondent Council was an unincorporated association composed of affiliated labor organizations. Id. at 1052. The secretary-treasurer of the Council, one Depolo, was the business agent of one of the affiliated labor organizations.[17] Id. Among other factors, the Board found that the Council was a labor organization because it obtained exemption from taxation under then existing provisions of the IRS Code consistent with those of a labor organization. The Board noted the following:

---

[17] Depolo participated in a Council meeting where picketing was authorized, just as here it is alleged that Jacobsen, as Director of the Fund, was directly involved in secondary boycott activity. See Wyoming Valley, 211 NLRB at 1052.

Further, Respondent Council has filed annual reports (forms 990) with the Internal Revenue Service on which the Council claims exemption from income tax under section 501(c)(5) of the Internal Revenue Code. This form provides certain activity codes whereby the party filing may identify its purposes and activities and what sort of organization it is. In this form, which was signed by Depolo under penalty of perjury, the Council claimed exemptions under codes 261, 262 and 263.

All three of these codes appear under the head: "Employee or Membership Benefits Organizations." Code 261 is "Improvement of Conditions of Workers." Code 262 is "Association of Municipal Employees" and code 263 is "Association of Employees."

Id. at 1054 (footnotes deleted).

Just as significantly, the Board found that by engaging in organizational activities such as picketing, the Council had dealt with employers meeting the statutory test for a labor organization:

From all the foregoing it is also clear that it is a "labor organization" within the framework of the definition of Section 2(5). For it exists certainly in part, for the purpose of dealing with employers at least in respect to grievances, labor disputes and conditions of work. Depolo's actions in seeking recognition for the constituent locals of the Council and in trying to organize Altemose's employees into these locals, indicates that the Council likewise exists, in part, for the purpose of dealing with employers in matters of collective bargaining. *For recognition is the necessary precondition to such a bargaining relationship and is within the broad scope of the term "dealing with" in Section 2(5) of the Act.* Finally, the Council has held itself out to the Internal Revenue Service as an association of employees, which I treat as a prior admission against interest for the purposes of this case. And, I hold, such employees are enabled to participate in the affairs of the Council through their delegates to it.

Id. at 1054 (emphasis added) (footnotes deleted).

The NLRB has thus held that organizational activities, "the necessary precondition to … a bargaining relationship", constituted "dealing with employers" as defined by 29 U.S.C. § 152(5).  It has also found that an organization's representations in its application for tax exempt status are relevant to that inquiry. As the Supreme Court has stated, the NLRB's interpretation of what type of organization falls within the statutory definition of a labor organization is entitled to deference:

> We see no reason to assume that the task of interpreting and applying the statutory definition of a 'labor organization' does not call for the same adjudicatory expertise that the Board must bring to bear when it determines the applicability of §§ 7 and 8 of the Act to substantive conduct. Indeed, analysis of the problem makes clear that the process of defining the term 'labor organization' is one which may often require the full range of Board competence.

Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 178 (1962).

In granting the Fund's Motion to Dismiss and determining that it was not a labor organization, the District Court stated that the Plaintiffs had not alleged that the Fund "exists to deal with or actually deals with employers", and that according to the Plaintiffs' "description, the Fund is prohibited from making proposals to employers".  JA 65.  The Court was presumably referring to the Fund's Agreement and Declaration of Trust, which states that its Trustees' powers shall be discharged solely with regard to Government Petitioning Activity, and that the Trustees were

43

expressly prohibited from engaging in any "picketing, boycotting or other union …

collective activities".   JA 13.   However, the Complaint went on to allege that

contrary to its Agreement and Declaration of Trust, the Fund in fact engaged in

union collective activities, as its Executive Director at least sought to contact

Wegmans regarding unionization, and the Fund then engaged in boycotting

activity, albeit secondary boycott activity.   JA 12, 14-16, 18.   As the NLRB has

recognized, such secondary boycott activity, with the purpose of putting pressure

on a third party with the objective of unionizing the primary employer, is the "*sine*

*qua non* to negotiation of a collective bargaining agreement and is within the broad

term 'dealing with' in Section 2(5) of the Act".   Bldg. & Constr. Trades Council of

Reading & Berks Cnty., 155 NLRB at 1186-87.   Certainly at this stage of the

proceeds, the allegations in the Complaint, coupled with the exhibits attached to

Plaintiffs' Opposition to the Fund's Motion to Dismiss and Supplemental Motion

to Dismiss, make the allegation that the Fund is a labor organization plausible.

## VII.  CONCLUSION

For those reasons set forth in above, the District Court's Order dismissing

Count I of the Amended Complaint should be reversed, and the case remanded for

further proceeds.

44

_/s/ Ira L. Oring_
Ira L. Oring (ilo@fedgar.com)
Neil Dubovsky (ndubovsky@fedgar.com)
Fedder and Garten Professional Association
36 South Charles Street, Suite 2300
Baltimore, Maryland 21201
(410) 539-2800
Attorneys for Appellants

**Supplement**

**Article 17-2-108 of the Anne Arundel County Code**

(a)    **Generally.** The Planning and Zoning Officer may approve an application for a modification to any provision of this article other than one contained in Titles 5, 8, or 9, except as allowed by §§ 17-5-203(b) and 17-5-205(b), and to any applicable regulations, manuals, or specifications, including the DPW Design Manual, upon finding that:

   (1)    practical difficulties or unnecessary hardship will result from strict application of this article;

   (2)    the purposes of this article, including minimization and mitigation of environmental impacts through the use of clustering or other available  design alternatives to preserve the character of the impacted area, will be served by an alternative proposal;

   (3)    the modification is not detrimental to the public health, safety, or welfare or injurious to other properties; and

   (4)    the modification does not have the effect of nullifying the intent and purpose of this article, the General Development Plan, or Article 18 of this Code.

(b)    **When modification may be denied.** An application for a modification may be denied if requested solely because compliance would add significantly to development costs or if requested solely for the convenience of the developer, such as when the land is not usable because of error or poor assumptions on the part of the developer.

(c)    **Modification not required.** At the discretion of the Planning and Zoning Officer, demolition of existing structures may proceed without a modification of site development plan requirements in order to abate a civil infraction that violates this Code or to protect the public health or safety.

(d)    **Modification to eliminate sketch plan review or preliminary plan review.** The Planning and Zoning Officer may grant a modification to the requirement of a sketch or preliminary plan review for redevelopment and development within the town center districts if the applicant demonstrates to the Planning and Zoning Officer's satisfaction that adequate public facilities will be available to serve the

development at the time of final plan or site development plan approval and that the final plan or site development plan will satisfy environmental site design standards and techniques for stormwater management and roads.

(e)    **Conditions.** In granting a modification, the Planning and Zoning Officer may require conditions to secure the objectives of the provision that has been modified.

### 29 U.S.C. § 152(5)

The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

### 29 U.S.C. § 158(b)(4)(ii)(B)

(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents…

[4](ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is…

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**29 U.S.C. § 187**

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

## Statement Regarding the Need for Oral Argument

The Plaintiffs believe that oral argument would benefit the Court in the consideration of this appeal.  The appeal will require this Court to consider each of the fourteen administrative challenges and lawsuits that the Defendants caused to be filed.  This Court will have to determine, on a case by case basis, whether Plaintiffs adequately pled that these matters were objectively baseless, based upon the *Twombly* and *Iqbal* standard.  Oral argument will offer the parties the opportunity to guide the Court through relevant portions of the detailed record below of each of these administrative appeals and legal challenges initiated by the Defendants.  Further, it will allow the parties to address the numerous legal issues pertaining to the Supreme Court's enunciation of the *Noerr-Pennington* doctrine, and the sham exception thereto, and any questions this Court may have with regard to the parties' positions related to those issues.  Finally, oral argument will allow the parties to fully address the record below and legal argument regarding whether it was adequately pled that the Fund is a labor organization, under the circumstances of this case.

49

## Certificate of Compliance

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


/s/ Ira L. Oring
Counsel for Appellants


Dated: May 21, 2012.

## Certificate of Filing and Service

I hereby certify that on the 22nd day of May 2012, this Appellant's Brief was filed electronically using the Court's CM/ECF system, which will send notice of such filing to counsel of record; that eight paper copies of the foregoing Appellant's Brief and six paper copies of the Joint Appendix were sent via Federal Express to the Clerk's Office; that one paper copy of the Joint Appendix was mailed by First Class, U.S. Mail postage paid to each counsel of record for each Appellee.

/s/ Ira L. Oring
Counsel for Appellants