No. 12-1429

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

WAUGH CHAPEL SOUTH, LLC et al.,

Plaintiffs - Appellants,

v.

UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 27 et al.,

Defendants - Appellees.

_____

On Appeal from the U.S. District Court for the District of Maryland
Hon. William D. Quarles, J.

_____

## APPELLEES' JOINT BRIEF

_____

Michael T. Anderson (arguing counsel)
Arlus J. Stephens
Lorrie E. Bradley
MURPHY ANDERSON PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620; Fax: (202) 223-8651
Attorneys for Appellee UFCW Local 27

Joel A. Smith
David Gray Wright
KAHN, SMITH & COLLINS, P.A.
201 North Charles Street. 10th Floor
Baltimore, MD 21201
(410) 244-1010; Fax: (410) 244-8001
Attorneys for Appellee UFCW Local 27

Carey R. Butsavage
John A. Durkalski
BUTSAVAGE & ASSOCIATES, P.C.
1920 L Street NW, Suite 510
Washington, DC 20036
(202) 861-9700; Fax: (202) 861-9711
Attorneys for Appellee UFCW Local 400

Barry S. Slevin (arguing counsel)
Sharon M. Goodman
Laura O. Aradi
SLEVIN & HART, P.C.
1625 Massachusetts Ave. NW, Suite 450
Washington, DC 20036
(202) 797-8700; Fax: (202) 234-8231
Attorneys for Appellee MRFI JLM Fund

## CORPORATE DISCLOSURE STATEMENT
### [Rule 26.1]

———————————————

Defendant-Appellees United Food & Commercial Workers Locals 27 and 400 are unincorporated labor organizations affiliated with the United Food & Commercial Workers International Union.

Defendant-Appellee Mid-Atlantic Retail Food Industry Joint Labor Management Fund is a Joint Labor Management Committee, as defined under §302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9), established by United Food and Commercial Workers Union Locals 27 and 400 and the Food Employers Labor Relations Association.

None of the Appellees have issued shares, bonds or other securities.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

A.   August 2008: Challenge to Rezoning for Failure to Disclose
     Environmental Contamination . . . . . . . . . . . . . . . . . . . . . . . . .  3

B.   December 2009: Challenge to Developers' Failure to Post
     Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

C.   March 2010: Challenge to County Council's TIF Resolution
     Due to Defective Notice and Hearing . . . . . . . . . . . . . . . . . . .  6

D.   Environmental Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     1.   June 2010: Nuisance and Injunctive Action Regarding
          Groundwater Contamination . . . . . . . . . . . . . . . . . . . . .  6

     2.   June 2010 Challenge to Mining Permits . . . . . . . . . . . .  10

     3.   2011 Challenge to Grading and Building Permits . . . . .  11

E.   Status of the Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

A.   *Noerr-Pennington* Immunity Is a Question of Law. . . . . . . . .  16

B.   The Plaintiff Has the Burden to Allege a Sufficiently
     Specific Basis to Rebut *Noerr-Pennington* Immunity. . . . . . .  16

     1.   Even before *Twombly*, a plaintiff suing to penalize
          petitioning had a heightened burden to plead facts
          overcoming *Noerr-Pennington* immunity. . . . . . . . . . .  16

     2.   Rule 12(b)(6) after *Twombly*  . . . . . . . . . . . . . . . . . . . .  17

C.   The Administrative and Judicial Record of All Proceedings
     Referenced in the Complaint Is Before the Court. . . . . . . . . .  18

     1.   The Complaint incorporates the full litigation record. . .  18

i

2. The legal significance of litigation records is evaluated without deference to the plaintiff's characterizations. . 18

D. The Court May Affirm on Any Ground Supported by the Record, Including Grounds Rejected by the District Court. . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. THE DEVELOPERS DO NOT ALLEGE THAT THE PETITIONS OBSTRUCTED THEIR ACCESS TO GOVERNMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. The "Sham" Exception Requires an Abuse of Process Barring Access to Government. . . . . . . . . . . . . . . . . . 20

1. *California Motor Freight* made access-barring the motivating rationale for the sham exception. 20

2. Fourth Circuit: *Hospital Building* and *Racetrac Petroleum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3. "Coercion" in secondary-boycott law is limited by the First Amendment distinction between opposition and obstruction. . . . . . . . . . . . . . . . . 25

B. The Petitions Imposed No Interim Restraint on the Developers' Ability to Obtain or Use their Permits. . . . 27

1. Maryland Rule 7-205 prevents the filing of challenges from blocking developers' use of their permits. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. Land-use challenges in Maryland are not an abuse of process, because they do not impose collateral restraint on landowners: *One Thousand Fleet Associates* . . . . . . . . . . . . . . . . . 28

3. The Developers' complaint about the "risk" that the challenges might succeed contradicts their sham claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4. Litigation does not become obstruction just because the Developers hired attorneys. . . . . . . . 31

|  | C. | The Developers' Theory Undermines Federalism: *Baltimore Scrap*. | 32 |
| | | 1. Maryland is entitled to police access to its own courts. | 32 |
| | | 2. Maryland provides a full remedy for the costs of baseless litigation, which the Developers bypass. | 33 |
| | D. | The District Court's Rejection of the Access-Barring Condition Is Contrary to Circuit Law. | 35 |
| II. | | THE PETITIONS WERE NOT BASELESS. | 37 |
| | A. | The August 2008 Challenge to Rezoning | 38 |
| | B. | The 2009 Challenge to the Developers' Failure to Post Bond | 40 |
| | C. | The 2010 Challenge to County TIF Vote | 41 |
| | D. | The 2010-2011 Environmental Challenges | 42 |
| | | 1. The fly ash problem is serious: the Bouwer report | 43 |
| | | 2. The Bouwer Report catalyzed the County to improve fly ash remediation. | 45 |
| | | 3. The Developers' remaining attacks on the opponents' petitions do not make out a sham. | 47 |
| III. | | THE FUND IS NOT A "LABOR ORGANIZATION." | 48 |
| | A. | The Fund's Status as a "Labor Organization" under I.R.C. §501(c)(5) Does Not Render it a "Labor Organization" under the NLRA. | 50 |
| | B. | The Fund's Trust Agreement and Internal Revenue Code Form 1024 Do Not Demonstrate That the Fund Is an NLRA "Labor Organization." | 52 |
| | C. | The Fund Conduct Alleged by the Appellants Does Not Demonstrate That the Fund Is an NLRA "Labor Organization." | 54 |
| CONCLUSION | | | 60 |

STATUTORY SUPPLEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . .   66

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . .   67

# TABLE OF AUTHORITIES

**Page(s)**

*A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Alvarado v. Montgomery Community College*, 848 F.2d 457 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Andrews v. U.S.,* 441 F.3d 220 (4th Cir. 2006) . . . . . . . . . . . . . . . .   50

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . .   17

*Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*BCD, LLC v. BMW Mfg. Co.*, 2008 WL 304878 *15 (D.S.C. 2008) .   24

*BE & K Construction Co. v. N.L.R.B.*, 536 U.S. 516 (2002) . . . . . . .   25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) . . . . . . . . . . .   17

*Bldg. & Constr. Trades Council of Reading & Berks County*, 155 N.L.R.B. 1184 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

*Bohle v. Thompson*, 78 Md.App. 614, 554 A.2d 818 (1989) . . . . . . .   34

*Borough of Duryea v. Guarnieri*, ___ U.S. ___, 131 S.Ct. 2488 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Brockington v. Boykins*, 637 F.3d 503 (4th Cir. 2011) . . . . . . . . . .   18

*Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*Calvert County Planning Comm'n v. Howlin Realty Management, Inc.*, 364 Md. 301, 772 A.2d 1209 (2001). . . . . . . . . . . . . . . . . . . .   32

*Century I Condominium Ass'n v. Plaza Condominium Joint Venture*, 64 Md.App. 107, 494 A.2d 713 (1985) . . . . . . . . . . . . . . .   33,34

*Christianburg Garment Co. v. E.E.O.C.,* 434 U.S. 412 (1978) . . . . .   38

*City of Bowie v. Prince George's County*, 384 Md. 413, 863 A.2d 976 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*City of Columbia v. Omni Outdoor Advertising,* 449 U.S. 365 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,30,37

*Clipper Exxpress v. Rocky Mountain Motor Tariff*, 690 F.2d 1240 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Compare Bright v. Moss Ambulance Service, Inc.*, 824 F.2d 819 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,26

*DeBartolo Corp. v. Fla. Bldg. Trades*, 485 U.S. 568 (1988) . . . . . . . 26

*Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*EFCO Corp. v. N.L.R.B.*, 215 F.3d 1318 (4th Cir. 2000) . . . . . . . . . 49

*Electromation, Inc.*, 309 N.L.R.B. 990 (1992) . . . . . . . . . . . . . . . . 49,58

*Environmental Integrity Project v. Mirant Ash Management*, 197 Md.App. 179 (Md.App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Foor v. Juvenile Services Administration*, 78 Md.App. 151 (1989)    34

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) . . . . . . . . . . . 17

*FWB Bank v. Richman*, 354 Md. 472 (1999). . . . . . . . . . . . . . . . . . 48

*Great Southwest Fire Ins. Co. v. S.M.A., Inc.*, 59 Md.App. 136 (Md.App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Holliday Amusement Co. v. South Carolina*, 493 F.3d 404 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hospital Building Co. v. Rex Hospital*, 691 F.2d 678 (4th Cir.1982)    Passim

*Hydro-Tech Corp. v. Sundstrand Corp..*, 673 F.2d 1171 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17,35

*Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056 (9th Cir.1998) . . . 17

*Litton Systems, Inc. v. AT&T Co.*, 700 F.2d 785 (2d Cir. 1983) . . . . 25

*McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552 (11th Cir.1992) . . . 17

*McCaffrey v. Rex Motor Transp., Inc.*, 672 F.2d 246 (1st Cir. 1982)    59

*Mickens v. Taylor*, 240 F.3d 348 (4th Cir. 2001) . . . . . . . . . . . . . . 36

*Miracle Mile Associates v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

*Molnar v. Wibbelt*, 789 F.2d 244  (3d Cir. 1986) . . . . . . . . . . . . . .    59

*Monroe v. City of Charlottesville*, 579 F.3d 380 (4th Cir. 2009) . . .    17

*N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322 (1981) . . . . . . . . . . . . . .    59

*N.L.R.B. v. Cabot Carbon*, 360 U.S. 203 (1959) . . . . . . . . . . . . . . .    56

*N.L.R.B. v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49,55

*National Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

*Nivens v. Gilchrist*, 444 F.3d 237 (4th Cir. 2006) . . . . . . . . . . . . . .    19

*Ohio River Valley Environmental Coalition, Inc. v. Green Valley Coal Co.*, 511 F.3d 407 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . .    41

*One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29 (1997) . .    14,29,30, 33

*Patuxent Riverkeeper v. Maryland Dept. of the Environment*, 422 Md. 294 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11,44

*Pendleton Construction Corp. v. Rockbridge County*, 837 F.2d 178 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23,24,25

*Princo Corp.*, 486 F.3d 1365 (Fed. Cir. 2007) . . . . . . . . . . . . . . . .    51

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Passim

*Racetrac Petroleum, Inc. v. Prince George's County*, 786 F.2d 202 (4th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Passim

*Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

*Rockefeller v. Powers*, 74 F.3d 1367 (2d Cir.1995) . . . . . . . . . . . .    24

*Rubloff Development Group, Inc. v. SuperValu, Inc.*, ___ F.Supp.2d ___, 2012 WL 1032784 *7 (N.D.Ill. 2012) . . . . . . . . . . . . . . . . . . .    41

*Sacramento Valley Chapter, Nat'l Elec. Contractors Ass'n v. Wallace*, No. 82-568, 1983 WL 2093 *2 (E.D. Cal. 1983) . . . . . . . .    60

*Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) .    36

*Terazosin Hydrochloride Antitrust Litigation*, 335 F.Supp.2d 1336 (S.D.Fla. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*TFWS, Inc. v. Franchot*, 572 F.3d 186 (4th Cir. 2009) . . . . . . . . . .  36

*Tupper v. U.S.*, 134 F.3d 444 (1st Cir. 1998) . . . . . . . . . . . . . . . . .  52

*U.S. v. Chila*, 871 F.2d 1015 (11th Cir.1989) . . . . . . . . . . . . . . . .  24

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) . . . . . . . .  13

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) . . . . . . . . . . . . . . . .  18

*Walker v. Kelly*, 589 F.3d 127 (4th Cir. 2009) . . . . . . . . . . . . . . . .  18

*Wallace v. Mercantile Bank*, 514 F.Supp.2d 776, 789-790 (D.Md. 2007) *aff'd* 307 Fed.Appx. 720 (4th Cir. 2009) . . . . . . . . . . . . . . . . .  33

*Waugh Chapel South LLC v. United Food & Commercial Workers Local 27*, _____ F.Supp.2d ___, 2012 WL 671678 (D.Md. 2012). . . .  1

*West Virginia Highlands Conservancy v. Kempthorne*, 569 F.3d 147 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42,46

*Westmac, Inc. v. Smith*, 797 F.2d 313 (6th Cir. 1986) . . . . . . . . . . .  25

*Winterland Concessions Co. v. Trela*, 735 F.2d 237 (7th Cir. 1984).  28

*Wood v. Meadows*, 117 F.3d 770 (4th Cir. 1997) . . . . . . . . . . . . . .  24

*Wyoming Valley Bldg. Constr. Trades Council*, 211 N.L.R.B. 1049 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57,58

## STATEMENT OF THE ISSUES

1.     Does the "sham" exception to *Noerr-Pennington* immunity allow federal sanctions against state land-use litigation, absent a claim that the litigation barred the Developers' access to government?

2.     Do the Developers have a plausible claim for "baseless" litigation?

3.     Is the Mid-Atlantic Retail Food Industry Joint Labor Management Fund a "labor organization" within the meaning of the National Labor Relations Act, 29 U.S.C. §152(5)?

## STATEMENT OF THE CASE

Appellants Waugh Chapel South, WCS LLC and WCS Properties Business Trust's ("the Developers'") Statement of the Case is correct. Appellant ELG Inglewood LLC's appeal as to its Woodmore Towne Centre project, Joint Appendix ("JA") 27-32, is withdrawn in Appellants' Brief at 3 n.1.

The District Court has now published its decision, *Waugh Chapel South LLC v. United Food & Commercial Workers Local 27*, ____ F.Supp.2d ___, 2012 WL 671678 (D.Md. 2012).

## STATEMENT OF FACTS

The Waugh Chapel South site in Anne Arundel County, Maryland is a former gravel mine that was for many years a dumping site for fly ash. Fly ash is a toxic byproduct of coal burned for power generation. "When fly ash and other types of CCBs [coal combustion byproducts] come into contact with water, leachate is created, which can drain into and pollute groundwater and nearby bodies of water." *Environmental Integrity Project v. Mirant Ash Management*, 197 Md.App. 179, 183 n.6, 13 A.3d 34, 37 n.6 (Md.App. 2010).

Local residents expressed concern about fly ash in the site's groundwater, leading to a September 28, 2007 Consent Decree between the Maryland Department of the Environment ("MDE") and the former owner of the property in 2007. JA 88-117. In the following years, the environmental group Patuxent Riverkeeper and local residents petitioned for review of the planned development's permits based on the fly ash problem. The Developers' Amended Complaint alleges (and for Rule 12(b)(6) purposes we may not contest) that these legal challenges were supported and financed by Appellees United Food & Commercial Workers Locals 27 and 400 ("the Unions") and the Mid-Atlantic Retail Food Industry Joint Labor Management Fund (the "Fund") to oppose construction of Wegmans, a non-union supermarket in the planned shopping center. JA 14-16.

2

### A.     August 2008: Challenge to Rezoning for Failure to Disclose Environmental Contamination

The Developers' lead partner Greenberg Gibbons and the site owner BBSS successfully applied to change the zoning of the Waugh Chapel site from "Rural Agricultural" and "Residential" to "Mixed-Use Commercial," in March 2006. JA 76. The owner's engineer testified: "The reclaimed mining property is easily developed and there are no environmental issues." JA 80. In a cover letter to the rezoning application, the site's owner claimed that "combustion ash is not a hazardous material." JA 399.

In September 2007, the owner BBSS and Constellation Power Source Generation (the power company that generated the fly ash) agreed to a Consent Decree over fly ash contamination that contradicted the owner's prior statements in the rezoning application. JA 88-117. The Consent Decree recited that the owner had been aware of groundwater contamination since 1999 and had installed a "pump and treat" system in 2004 to address "elevated concentrations of sulfates and heavy metals." JA 91. The Consent Decree recited that groundwater samples collected in 2006 and 2007 showed that residential water wells near the site still contained heavy metal and sulfates at levels exceeding the standards. JA 92. The Consent Decree required the site owner and Constellation jointly to pay a civil penalty of one million

3

dollars for past violations. JA 95.

An order approving rezoning may be rescinded, if the approval was "based upon a fraudulent misrepresentation of material information . . ." Anne Arundel County Code § 18-16-404(a)(1). Local 27 officer George R. Murphy, later joined by twelve other local residents, filed a Motion to Rescind Zoning on August 21, 2008. They alleged that the site owner made material misrepresentations in applying for the 2006 rezoning. JA 19.

The County and the intervening Developers moved to dismiss the Motion to Rescind on November 12, 2008, arguing that the movants lacked standing as "aggrieved parties." They argued that under the County Code, motions to rescind zoning are only available to "parties," which (they argued) disqualified any aggrieved resident who had not participated in the initial rezoning hearing. JA 425-28; 410-416. The Developers also argued in the alternative that each of the movants' property interests were not sufficiently close to the rezoned property,[1] to make them "aggrieved" under environmental standing rules. JA 416-428.

The petitioners withdrew the Motion to Rescind on November 18, 2008. JA

_____

[1]The Developers mischaracterize the record by stating that two of the movants "falsely listed their home addresses in the Motion to Rescind." Appellants' Brief at 17. The Movants' addresses were stated accurately – the issue was whether, as lessees and/or tenants, they qualified as "aggrieved" when they were not the fee-simple owners. JA 426, 428.

441. The pendency of the Motion did not affect the Developers' right to proceed under their "Mixed-Use Commercial" zoning they had obtained in 2006. Under Anne Arundel County Code § 18-16-404(a), the filing of a Motion to Rescind Zoning has no interim effect on the property owner's rights, unless a hearing officer sustains the motion and rescinds the zoning decision.

### B.    December 2009: Challenge to Developers' Failure to Post Bond

Anne Arundel County Code §§ 17-2-108 and 17-6-702 required the Developers to post a bond and pay fees to obtain a grading permit. JA 20. In July 2009, Developer WCS LLC requested a deferral of the fee and bond requirement and then requested a second extension three months later. The County granted both requests on November 5, 2009. JA 20, 444. Section 17-2-108(b) authorizes denial of an extension if it is "requested solely because compliance would add significantly to development costs or if requested solely for the convenience of the developer." The Patuxent Riverkeeper and two local residents appealed the deferral of the bond to the County Board of Appeals on December 3, 2009. JA 20-21, 442-43.

While this appeal was pending, the Developer posted the fees and bond  on February 9, 2010. JA 21. The petitioners then withdrew their appeal. JA 21.

### C.  March 2010: Challenge to County Council's TIF Resolution Due to Defective Notice and Hearing

On March 15, 2010, the Anne Arundel County Council extended a Tax Increment Financing ("TIF") bond to the Developers. JA 21, 127-135, 280.

On March 17, 2010, local residents Robert Smith and Madonna Brennan sought a declaratory judgment against the County in Circuit Court that the enactment of the TIF bill was invalid because it was not publicized in the newspaper before passage; was not given a final reading; and a hearing was not set regarding the bill, in violation of Article XI-A § 3 of the Maryland Constitution and the County Council Rules of Procedure. JA 21-22, 275-283.

After this suit was filed, the County Council introduced a new resolution to replace the defective TIF bill, and scheduled a hearing on the matter with the proper public notice and hearing identified in the lawsuit. JA 21-22. On May 10, 2010, the Council enacted the revised TIF into law. *Id*. The petitioners then voluntarily dismissed their suit. JA 22.

### D.  Environmental Challenges

#### 1.  June 2010: Nuisance and Injunctive Action Regarding Groundwater Contamination

The Patuxent Riverkeeper and Robert Smith filed a complaint in Circuit Court on June 28, 2010, alleging that MDE and Anne Arundel County failed to adequately

6

monitor and remediate the groundwater contamination at the Waugh Chapel site,

creating a public and private nuisance. JA 22, 136-165. The complaint alleged that a

plume of contaminants had spread beyond the monitored area, and that development

would make it more difficult to monitor the spread of the plume. JA 151-152. The

action sought a writ of mandamus to compel MDE to enforce the Consent Decree

and sought injunctive relief preventing the further issuance of mining, development

and building permits until the nuisance was abated. JA 156-160. The complaint also

brought a common-law nuisance claim against the site owners and the Developers'

lead partner, seeking injunctive relief against further development until the

contamination was remedied. JA 155-157.

In support of its complaint, the Patuxent Riverkeeper commissioned a expert

report by Professor Edward Bouwer, Chair of the Johns Hopkins University

Department of Geography and Environmental Engineering, issued December 10,

2010. JA 170-187. Based on monitoring well results and geological data for the site,

Professor Bouwer concluded that current fly ash remediation at the site was

inadequate, that the contamination had spread horizontally beyond the monitored

area, and that there was a significant risk for fly ash contamination to migrate

vertically and contaminate lower aquifers. JA 174-175. Professor Bouwer concluded:

"From an environmental engineering perspective, the construction of the proposed

development above the Turner Pit is not recommended until the remediation system is modified to better capture the contaminant plume and a more effective monitoring plan is implemented. . . . Development of the site now and the planned construction will make it more difficult to access the site in the likelihood that future remediation efforts are required." JA 175.

Anne Arundel County Executive John Leopold received the Bouwer report before it was filed in Court. On December 28, 2010, County Executive Leopold sent a letter to the County's co-defendant MDE, citing the Bouwer report as "signal[ing] the need for immediate action" and asking MDE to "implement a remediation plan that is consistent with [the Bouwer report's] findings, as soon as possible." JA 188-89. The next day, Leopold instructed the County's Department of Inspections and Permits to review the Bouwer report: "[G]rading permits have been issued for the referenced site which is also a site where Fly Ash has been used as fill. The report cited above gives me significant concerns about how the work at this site might affect the public health and general welfare in later years. . . . [M]y concerns are such that I find it appropriate to ask that your department conduct the necessary reviews to ensure that the placement and handling of Fly Ash on this site is consistent with the [Consent Decree]." JA 190-191.

On May 17, 2011, the Circuit Court (Silkworth, J.) granted summary judgment

dismissing the claims in the nuisance/injunction action, some with prejudice, and others without prejudice. The Circuit Court relied on MDE's primary jurisdiction to monitor and enforce the Consent Decree, which it held was not amenable to mandamus or injunction. JA 258-260, 271. The Circuit Court dismissed the claim for declaratory judgment as to nuisance, holding that MDE's primary jurisdiction over the Consent Decree made the claim nonjusticiable. JA 263-264. The Circuit Court dismissed the claim for injunction based on nuisance without prejudice, on the ground that "MDE should continue to exercise its special expertise and continue to enforce the Consent Decree." JA 267.

As to the claims for injunction against permit issuance, the Circuit Court dismissed as moot claims against permits that had already issued. JA 268-269. As to the claims against the issuance of future permits, the Court agreed with the County and the Developers that "Plaintiffs must exhaust administrative remedies to challenge the issuance of the permits before seeking judicial review. . . . Plaintiffs may certainly follow the administrative procedures for challenging the permits mentioned in the Complaint that have not yet been issued." JA 269.

An appeal of the Circuit Court's decision is currently pending at the Maryland Court of Special Appeals, (Case No. 00788). JA 1029. The opponents dismissed their appeal against the Developers, because the shopping center development

9

project is substantially complete; the appeal continues as to BBSS and Constellation, the power company that was the source of the fly ash. JA 1029.

### 2.    June 2010 Challenge to Mining Permits

One day after the Nuisance Complaint was filed, MDE issued a renewal of the site owner's surface mining permit. JA 23. Patuxent Riverkeeper and three local residents filed a petition for judicial review in Circuit Court and a sought a stay of the permit. JA 23. MDE issued a corrected permit approximately one month later to address a clerical error in the original permit. JA 24. As a protective measure, the petitioners challenged the corrected permit as well. JA 24. The petitioners outlined the history of groundwater contamination, and submitted two affidavits explaining why they feared that proceeding on the permit would threaten the spread of groundwater contamination. JA 286-318 (stay briefs); JA 448-454 (affidavits).

On September 3, 2010, the Circuit Court (Caroom, J.) held that the petitioners lacked standing to challenge the mining permit renewal, applying the federal standing test for "injury in fact." JA 195-197. The Circuit Court denied a stay of the mining permit. The Court criticized the affiants for not being experts. JA 196-197. Weighing the balance of harms, the Circuit Court held that a stay of the mining and landfilling activity would pose a greater economic harm to the Developers due to a "loss of development financing and momentum in the reclamation process." JA 200.

10

The petitioners appealed both mining permit challenges to the Maryland Court of Special Appeals and moved to consolidate them. Because the appeal concerned the petitioners' standing, the Developers moved to stay the appeal "because the precise issue presented in this case, *i.e.* the proper application of the federal test for standing in environmental cases, is currently pending before the Court of Appeals of Maryland." JA 204. This case, *Patuxent Riverkeeper v. Maryland Dept. of the Environment* involved challenges to the Woodmore Town Centre project. *Patuxent Riverkeeper* was the subject of the second count of the Developers' "sham litigation" complaint in this case. JA 27-32. The Developers initially argued to Judge Quarles that the Patuxent Riverkeeper was a union proxy who made "sham" assertions of standing to challenge the Woodmore project, D.Ct. Dkt. 35 at 41-43, but withdrew this claim after the Maryland Court of Appeals ruled that the Patuxent Riverkeeper did have standing, reversing the lower courts. *Patuxent Riverkeeper v. Maryland Dept. of the Environment*, 422 Md. 294, 29 A.3d 584 (2011). The appeal is now pending decision by the Maryland Court of Special Appeals (Case 01655.)

### 3.     2011 Challenge to Grading and Building Permits

County residents Sandra Bowie and Robert Smith filed petitions for review of the Developers' grading and building permits in 2011, claiming that the issuance of the permits "prior to a complete understanding of the existing groundwater

contamination at the site will prevent proper remediation and prevention of further contamination." JA 24-25, 541-570. The appeals disclaimed any effort to impose a stay, asking only for a hearing. JA 543. The four grading appeals were consolidated into a single case, as were the five building permit appeals. JA 572. These appeals were later withdrawn, allegedly in response to the Developers' discovery demands about the payment of their legal fees. JA 25-26.

### E.    Status of the Fund

The Mid-Atlantic Retail Food Industry Joint Labor Management Fund (the "Fund") is a joint labor-management committee, as defined under § 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(9), established by United Food and Commercial Workers Union Locals 27 and 400, and the Food Employers Labor Relations Association, for the purposes of improving labor-management relationships, improving job security, improving organizational effectiveness, enhancing economic development, and monitoring the conditions of employees engaged in the retail food industry. JA 12-13. The Fund is governed by a Board of Trustees equally appointed by representatives of contributing employers and representatives of UFCW Locals 27 and 400. JA 12.

## SUMMARY OF ARGUMENT

The Developers are suing United Food & Commercial Workers (UFCW) Locals 27 and 400, along with the Mid-Atlantic Retail Food Industry Joint Labor Management Fund, for $25 million, for allegedly supporting legal challenges to the now-completed Waugh Chapel development project. The Complaint does not allege picketing, strikes, violence or the threat thereof. The Developers' claim is simply that petitions for review constituted "threats, restraint or coercion" in violation of the secondary-boycott provisions of 29 U.S.C. §§158(b)(4)(B) and 187.

In Parts I and II, all Appellees argue that the Developers' claim is barred by the *Noerr-Pennington* doctrine, which precludes liability for petitioning the government. *See Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140-141 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). The Developers stake their case on the theory that the petitions were a "sham" within the exception to *Noerr-Pennington* defined in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511-12 (1972).

In Part I of the Argument, we show that the Complaint fails at the threshold, because the Developers do not claim that the petitions obstructed their ability to obtain or use their permits. The defining element of a "sham" is that the litigation must have deprived the plaintiffs of their own First Amendment right to be heard,

13

such that "the machinery of the agencies and the courts [be] effectively closed to [the developers] and [the Defendants] indeed became the regulators of rights, transfers and registrations . . ." *California Motor*, 404 U.S. at 511. *See Racetrac Petroleum, Inc. v. Prince George's County*, 786 F.2d 202, 203 (4th Cir.1986), *adopting* 601 F.Supp. 892, 909 (D.Md.1985); *Hospital Building Co. v. Rex Hospital*, 691 F.2d 678, 687-688 (4th Cir.1982).

The Developers cannot allege this element. In every case alleged in the Complaint, the Developers successfully obtained all permits and approvals they sought without hindrance. In Maryland, a subsequent petition for review does not block developers' interim use of permits absent a court order. *See* Md. Rule 7-205; *One Thousand Fleet Limited P'ship v. Guerriero*, 346 Md. 29, 46, 694 A.2d 952, 960 (1997). This forecloses any application of the "sham" exception.

The Developers' broader theory threatens federalism. Absent an allegation that the state litigation barred the Developers' access to the zoning process, their theory is nothing more than a federalized claim for sanctions for "unjustified" state litigation. The Developers should have made this claim to the Maryland courts. This Circuit refuses to broaden the "sham" exception to make federal courts supervise all state litigation between economic opponents. *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 404 (4th Cir. 2001).

14

The District Court held that the "sham" exception does not require obstruction of access. JA 48-50. If the District Court's approach is correct, every federal court in this Circuit will have to conduct the same review of the "minutiae of state civil proceedings" that *Baltimore Scrap* warned against. 237 F.3d at 404. Although the District Court was correct that the petitions were not baseless, it should not have reached this question. This Court should affirm on the threshold ground that the petitions did not block the Developers' access to the zoning process in the first place.

In Part II, we show that the challenges were not baseless as a matter of law. The challenges to the bond waiver and the TIF enactment achieved the results sought. The environmental challenges relating to fly ash contamination at the site were well-founded. The Waugh Chapel site <u>does</u> have an ongoing environmental problem with groundwater contamination from fly ash. The project opponents' case against development at the site was supported by an expert report by Professor Edward Bouwer, Department Chair of Geography and Environmental Engineering at Johns Hopkins. JA 170-187. Professor Bouwer's report motivated the County Executive to push for stronger remediation measures. JA 188-191. Even though the Circuit Court believed the Developers' more optimistic views, the Bouwer report supported the opponents' claims, which cannot be condemned as "baseless."

In Part III, the Fund argues that Appellants have failed to state a claim against

15

the Fund, because they do not allege any facts in support of a finding that the Fund is a "labor organization" as defined by the National Labor Relations Act ("NLRA"). Appellants' allegations relating to the Fund's tax exempt status, Trust Agreement, Form 1024, and actions of the Fund's executive director, do not support a finding that the Fund is a "labor organization."

## STANDARD OF REVIEW

**A.    *Noerr-Pennington* Immunity Is a Question of Law.**

The Developers argue that *Noerr-Pennington* immunity is a question of fact. Appellants' Brief at 8, citing out-of-circuit and district court cases. This is contrary to Supreme Court and Fourth Circuit law. The application of *Noerr-Pennington* immunity, including whether a prior lawsuit is baseless, is a question of law for the Court. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 63 (1993); *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003).

**B.    The Plaintiff Has the Burden to Allege a Sufficiently Specific Basis to Rebut *Noerr-Pennington* Immunity.**

**1.    Even before *Twombly*, a plaintiff suing to penalize petitioning had a heightened burden to plead facts overcoming *Noerr-Pennington* immunity.**

*Noerr-Pennington* is more than an ordinary affirmative defense. It is an inherent hurdle to any pleading that identifies petitioning as the basis of liability.

Because petitioning the government enjoys a presumption of immunity, "the burden is on the party opposing application of *Noerr-Pennington* to allege facts sufficient to show that it does not apply." *IGEN Int'l.*, 335 F.3d at 311, *citing McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 n.9 (11th Cir.1992). *See also Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir.1998); *Hydro-Tech Corp. v. Sundstrand Corp..*, 673 F.2d 1171, 1177 n.8 (10th Cir.1982).

### 2. Rule 12(b)(6) after *Twombly*

The standard of review under Rule 12(b)(6) has become more demanding after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The more demanding rule of *Twombly* and *Iqbal* became necessary in light of "the recognized problems created by 'strike suits.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.' It requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis*, 588 F.3d at 193, *quoting Iqbal*, 556 U.S. at 678.

After *Twombly*, "the court need not accept the legal conclusions drawn from the facts, and need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Monroe v. City of Charlottesville*, 579 F.3d 380,

385-386 (4th Cir. 2009) (dismissing conclusory allegations that the plaintiff was "coerced" and "seized.").

### C. The Administrative and Judicial Record of All Proceedings Referenced in the Complaint Is Before the Court.

#### 1. The Complaint incorporates the full litigation record.

The Developers' express reference to the state litigation places the entire administrative and judicial record before the Court on a Rule 12(b)(6) motion. *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009).

#### 2. The legal significance of litigation records is evaluated without deference to the plaintiff's characterizations.

The Developers argue that they are entitled to have all inferences from the court records drawn in their favor. Appellants' Brief at 14, *citing Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). This is only true where the records bear on a question of fact. The evaluation of pleadings for "baselessness" is a question of law. *See Professional Real Estate*, 508 U.S. at 63-64.

When the Court has judicial notice of extrinsic material on Rule 12(b)(6) review, the Court does not defer to the plaintiff's legal characterization of them. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). "The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction

18

and meaning to be given the material." Wright & Miller, 5A *Federal Practice and Procedure* §1327 & n.21 (3d ed. 2012), *citing Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991).

**D.    The Court May Affirm on Any Ground Supported by the Record, Including Grounds Rejected by the District Court.**

In reviewing a dismissal for failure to state a claim, the Court may affirm on any ground supported by the record, including grounds that the District Court specifically rejected. *Nivens v. Gilchrist*, 444 F.3d 237, 248-249 (4th Cir. 2006). Appellees are not required to file a cross-appeal to urge alternative grounds for the dismissal. *See Nivens*, 444 F.3d at 248-249.

<u>**ARGUMENT**</u>

**I.    THE DEVELOPERS DO NOT ALLEGE THAT THE PETITIONS OBSTRUCTED THEIR ACCESS TO GOVERNMENT.**

As we show in Part II, below, the District Court correctly determined that the opponents' state-law petitions were not baseless. But the District Court should not have had to decide these state-law zoning issues. The Developers do not allege the threshold element of the "sham" exception – that the mere filing of these challenges obstructed the Developers' use of their permits. The Court should affirm the dismissal on this ground, even though the District Court rejected it. JA 48-50.

A.     **The "Sham" Exception Requires an Abuse of Process Barring Access to Government.**

1.     *California Motor Freight* **made access-barring the motivating rationale for the sham exception.**

The Developers argue that the litigation is a "sham" within the exception to *Noerr-Pennington* defined in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511-512 (1972). The Developers' claim does not fall within the *California Motor* rationale, because the litigation did not "effectively bar[] [them] from access to the agencies and courts." *See id.*, 404 U.S. at 513.

The defining element of a "sham" is that the litigation deprives the Developers' own First Amendment right to petition, such that "the machinery of the agencies and the courts [were] effectively closed to [the Developers] and [the opponents] indeed became the regulators of the grants of rights, transfers and registrations . . ." *Id.*, 404 U.S. at 511. *California Motor* dealt with allegations that opponents had clogged the permitting agency with so many baseless objections that the plaintiffs' applications for permits could not even be heard. *See id.* at 511-513.

In *Professional Real Estate*, the Court reiterated that the "sham" exception depends, not merely on baseless litigation, but on the <u>use</u> of it to bar access: "Our recognition of a sham in [*California Motor*] signifies that the institution of legal proceedings 'without probable cause' will give rise to a sham if such activity

effectively 'bar[s] . . . competitors from meaningful access to adjudicatory tribunals and so . . . usurp[s] th[e] decisionmaking process.'" 508 U.S. at 58, *quoting California Motor*, 404 U.S. at 512.

### 2.    Fourth Circuit: *Hospital Building* and *Racetrac Petroleum*

The Fourth Circuit requires a showing that litigation bars access. In *Hospital Building Co. v. Rex Hospital*, 691 F.2d 678, 687-688 (4th Cir.1982), this Court refused to approve jury instructions on sham-exception liability that extended to <u>any</u> "abuse of . . . process . . . to restrain trade." The Court approved "sham" liability only where there was particular proof of "denial of meaningful access" to the government:

> At page 27 of its instructions the [district] court says that "conduct in abuse of the adjudicatory or judicial process which is part of a larger conspiracy to restrain trade or to monopolize a market is not immune from the antitrust laws." We are unprepared at this time to approve such an unnecessarily broad definition of the sham exception. As noted above, HBC asserts that it proved a conspiracy <u>to deny it meaningful access to the Central Planning Council</u> and that it proved appellants undertook fruitless appeals <u>solely to delay approval of HBC's application</u>. We find that proof of misrepresentations made with this type of intent clearly falls within the sham exception to

21

*Noerr-Pennington*, but hesitate at this time to rule that any act

accompanying a larger conspiracy in restraint of trade, which also may

be fairly characterized as "abuse of process," falls within the sham

exception.

*Hospital Building*, 691 F.2d at 687-688 (emphasis added).

Four years later, the Fourth Circuit applied this requirement to Maryland land-use challenges in *Racetrac Petroleum, Inc. v. Prince George's County*, 786 F.2d 202, 203 (4th Cir.1986) *adopting district court opinion*, 601 F.Supp. 892, 910-911 (D.Md.1985). *Racetrac Petroleum* noted that "*California Motor Transport* has been followed by confusing and contradictory decisions in the lower courts concerning the scope of the sham exception . . ." 601 F.Supp. at 909. *Racetrac Petroleum* staked out a narrow view of the "sham" exception, limited to conduct that deprives the plaintiff of its own First Amendment right of petition:

[T]he sham exception serves the same purpose as the *Noerr-Pennington*

doctrine of which it has become a part. The exception protects free

speech and the governmental decision-making process by attaching

liability to those who would act to muffle the voices of competitors

seeking access to government.

601 F.Supp. at 910.

*Racetrac Petroleum* granted judgment for the defendant under

*Noerr-Pennington* because the plaintiff (like the Developers here) could not show

that its access to the Maryland zoning process was hindered by its opponents'

objections: "[P]laintiff will be able to prove at best that the Association Defendants

conspired with Association members to oppose and defeat a number of zoning

applications. . . . Defendants' actions had neither the purpose nor effect of barring

plaintiff's access to governmental process. At every stage at which Racetrac's

application was reviewed, and before every body considering plaintiff's application,

plaintiff was afforded a full opportunity to present its views and to support them with

evidence." *Id.*, 601 F.Supp at 910-911. "[T]here is no evidence that any potential

applicants were discouraged from invoking the zoning processes. . . . [I]t is clear that

plaintiff was never hindered or dissuaded from bringing and pressing its application.

Thus, even if plaintiff's claim of baseless and reflexive opposition was supported . . .

the injuries which it asserts have no relation to that claim." *Racetrac Petroleum*, 601

F.Supp. at 911 n.24.

Two years later, the Fourth Circuit published its adoption of another district

court opinion following *Racetrac Petroleum* on this ground. *Pendleton Construction*

*Corp. v. Rockbridge County*, 837 F.2d 178, 179 (4th Cir. 1988), *adopting* 652

F.Supp. 312, 320 (W.D.Va.1987) (following *Racetrac Petroleum* on access-barring;

23

"Like the actions of the association defendants in *Racetrac*, the actions of the Barger Defendants 'had neither the purpose nor effect of barring plaintiffs access to governmental process.'") *See also BCD, LLC v. BMW Mfg. Co.*, 2008 WL 304878 *15 (D.S.C. 2008) ("the holding in *California Motor Transport* is limited to attempts to deny a party's access to the courts or other adjudicatory tribunals. . .").

The Developers argued below that *Racetrac Petroleum* was only a district court decision, whose affirmance by the Fourth Circuit had no precedential value. The Developers would be right if the affirmance had been an unpublished Table opinion. But the Fourth Circuit published its decision adopting the district court's "thorough and well-reasoned opinion." *Racetrac Petroleum*, 786 F.2d at 203, as it did in *Pendleton Construction*, 837 F.2d at 179.

This incorporated the district courts' opinions as the law of the Circuit. *See Wood v. Meadows*, 117 F.3d 770, 775 (4th Cir. 1997) (Fourth Circuit makes precedent by adopting by published opinion the district court's reasoning); *accord Alvarado v. Montgomery Community College*, 848 F.2d 457, 459 (4th Cir. 1988) (Fourth Circuit makes precedent by adopting prior vacated panel opinion). *See also National Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 838 (6th Cir. 2010) (lower court opinion adopted in published circuit decision becomes circuit law); *Rockefeller v. Powers*, 74 F.3d 1367, 1382 (2d Cir.1995) (same); *U.S. v. Chila*, 871

24

F.2d 1015, 1018 (11th Cir.1989) (same).

While there are differing views among the Circuits about the scope of the "sham" exception, *Hospital Building*, *Racetrac Petroleum* and *Pendleton Construction* align the Fourth Circuit with the courts that adhere to the original access-barring rationale. *Compare Bright v. Moss Ambulance Service, Inc.*, 824 F.2d 819, 822-823 (10th Cir. 1987) (access-barring required); *Westmac, Inc. v. Smith*, 797 F.2d 313, 318 (6th Cir. 1986) (same); *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir. 1985) (same); *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980) ("access-barring is the cornerstone to the sham exception") *with Clipper Exxpress v. Rocky Mountain Motor Tariff*, 690 F.2d 1240, 1259 (9th Cir. 1982) (access-barring not required, though some abuse of process must be alleged); *Litton Systems, Inc. v. AT&T Co.*, 700 F.2d 785, 809 n.36 (2d Cir. 1983) (without citing *Miracle Mile* or intervening superior authority, subsequent Second Circuit panel holds access-barring not required). *See generally* Wooster, *"Sham" Exception to Application of Noerr-Pennington Doctrine*, 193 A.L.R. Fed. 139 (2009) §4(a)-(b) (outlining division in the courts).

### 3.    "Coercion" in secondary-boycott law is limited by the First Amendment distinction between opposition and obstruction.

The *Noerr-Pennington* doctrine applies to claims of "coercion" under labor law. *See BE & K Construction Co. v. N.L.R.B.*, 536 U.S. 516, 526 (2002). *BE & K*

25

*Construction* explained that *Noerr-Pennington* enforces the same First Amendment

defense recognized in secondary-boycott cases. 536 U.S. at 535-536, *citing*

*DeBartolo Corp. v. Fla. Bldg. Trades*, 485 U.S. 568, 575 (1988).

In *DeBartolo*, the Court held that union opposition to secondary businesses is

not inherently unlawful. It only becomes unlawful when it crosses the line from free

speech to obstruction. In *DeBartolo*, union handbills asked customers to boycott a

secondary shopping mall; this was not "coercion," even though the handbills were

intended to pressure the mall's dealings with one of its tenants. 485 U.S. at 579-580.

The Court distinguished free speech against a business from outright picketing,

because only the latter directly obstructs the business. *Id.*, 485 U.S. at 580.[2]

As a result, union petitioning against a secondary business' interests does not

become "coercion" unless it obstructs the business' own access to government. *See*

*Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 325 (5th Cir. 1986)

(rejecting secondary-boycott claim against union lobbying: "the sham exception

requires distinguishing between seeking to influence public officials, which is

---

[2]The District Court held that *DeBartolo* was irrelevant to this case, because it
defines what activity is "coercive," rather than the constitutional issue of "sham"
under *Noerr-Pennington*. JA 50 n.16. But *DeBartolo* interprets the very statute
that the Developers invoke- the secondary-boycott provision of 29 U.S.C.
§§158(b)(4)(B) and 187. If under *DeBartolo,* the petitions here are not "coercive,"
the complaint must be dismissed on statutory as well as First Amendment grounds.

26

permitted by *Noerr-Pennington*, and seeking to bar their competitors from

meaningful access to adjudicatory tribunals and the decision-making process," *citing*

*California Motor*).

### B. The Petitions Imposed No Interim Restraint on the Developers' Ability to Obtain or Use their Permits.

#### 1. Maryland Rule 7-205 prevents the filing of challenges from blocking developers' use of their permits.

The Developers do not allege that union-backed petitions prevented them from

obtaining County permits. In every case alleged in the Complaint, the Developers

had already obtained the permits and approvals they sought. *Compare California*

*Motor*, 404 U.S. at 511 ("the machinery of the agencies and the courts was

effectively closed to respondents. . .")

The Developers are only complaining about petitions for review of permits

already awarded. This might make out a colorable "sham" claim if Maryland law

allowed the mere filing of a petition for review to block the use of the permits in the

interim (as California law allegedly did in *California Motor*).

But Maryland law protects developers in this respect. In Maryland, petitions

for review of administrative actions cannot stay the agency's action unless the court

orders otherwise. *See* Maryland Rule 7-205 ("The filing of a petition does not stay

the order or action of the administrative agency. Upon motion and after hearing, the

27

court may grant a stay, unless prohibited by law, upon the conditions as to bond or otherwise that the court considers proper.") Rule 7-205 applies to zoning and land-use cases – a permit holder is free to proceed on the permit without restraint during the pendency of petitions for review. *See City of Bowie v. Prince George's County*, 384 Md. 413, 429-430, 434, 863 A.2d 976, 985, 988 (2004).

In protecting permit holders' right to proceed, Maryland law prevents the "obstruction through the mere filing of baseless challenges" that the "sham" exception requires.

> **2.    Land-use challenges in Maryland are not an abuse of process, because they do not impose collateral restraint on landowners: *One Thousand Fleet Associates***

The *California Motor* Court used the term of art "abuse of process" deliberately. 404 U.S. at 513. So did this Circuit in *Hospital Building*, 691 F.2d at 688. The "sham" exception tracks the common-law tort of abuse of process. *See Winterland Concessions Co. v. Trela*, 735 F.2d 237, 263 (7th Cir. 1984).

"Abuse of process" entails some collateral restraint imposed by the litigation process itself, as the Court insisted for the sham exception. *See Professional Real Estate*, 508 U.S. at 61, *citing City of Columbia v. Omni Outdoor Advertising,* 449 U.S. 365, 381 (1991). Because project opponents in Maryland cannot block development just by filing petitions for review, Maryland does not consider land-use

28

challenges (even when repetitive and unsuccessful) to be an abuse of its legal

process. *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 46, 694 A.2d

952, 960 (1997) (repetitive opposition to zoning applications is not abuse of process,

because it cannot impose any coercive writ like an attachment or a *lis pendens*).

While developers often choose to hire expensive attorneys to intervene against these

petitions, the cost of hiring lawyers does not establish an abuse of process. *See id.*,

346 Md. at 44-45, 694 A.2d at 958-959.

### 3. The Developers' complaint about the "risk" that the challenges might succeed contradicts their sham claim.

The Developers argue that the litigation imposed delay due to "risk" for which

they are entitled to $25 million in damages. JA 11, 19. They articulated this theory

below: "each of the actions . . . were designed to attack zoning, financing, and permit

approvals with the single objective to interfere with and obstruct the Waugh Chapel

South development. If any of those actions had achieved their professed objective,

the developers would have suffered potentially catastrophic consequences. They

were therefore left with no choice but to intervene to protect their interests . . ." D.Ct.

Dkt. 35 at 24-25 (emphasis added.)

This shows what is wrong with the Developers' theory. The outcome that the

challenges sought was an order revoking the permits. But opponents have a First

Amendment right to seek this outcome, no matter how harmful that outcome might

29

be to the Developers' interests. *Omni Outdoor Advertising*, 449 U.S. at 381. For example, the opponents moved for a stay in the nuisance suit that would have halted the development, but they could not obtain this outcome unless the Court granted it. *See* JA 157-160. In this case, the Circuit Court weighed the equities and denied the stay. *Id*. The "sham" exception does not apply where the petitioned-for outcome would be harmful, but only when litigation obstructs access merely by the fact of being filed. *See Professional Real Estate*, 508 U.S. at 61, *citing Omni Outdoor Advertising*, 449 U.S. at 381. Because Maryland does not allow this to happen in zoning cases, *see* Maryland Rule 7-205; *One Thousand Fleet*, 346 Md. at 46, 694 A.2d at 960, the Developers have no genuine claim for "sham" litigation.

The Developers appear to claim that they delayed their project, not because of any legal restraint, but because of anxiety over the "risk" that the challenges might succeed. This argument tacitly concedes that the petitions were <u>not</u> objectively baseless. If the petitions were in fact baseless (*i.e.*, "no reasonable litigant could realistically expect [them] to succeed on the merits," *Professional Real Estate*, 508 U.S. at 60) then the Developers faced no reasonable risk – only the annoyance of disposing of them. The Developers cannot have it both ways. If the petitions had no chance of prevailing, then the Developers cannot claim $25 million in damages for the "risk" that they might have succeeded.

30

### 4.    Litigation does not become obstruction just because the Developers hired attorneys.

The Developers' only remaining claim of obstruction is that they expended attorneys' fees to intervene against the petitions. JA 19.

This theory would obliterate the "economic" prong of *Noerr-Pennington*. All litigation causes opposing parties to hire lawyers. If the cost of hiring lawyers were a sufficient harm, the "economic" prong of *Noerr-Pennington* would be meaningless, because it would apply in all cases.

The Developers have no plausible claim that their attorney bills obstructed their access to the zoning process. According to the Complaint, Waugh Chapel is a $260 million project on which the Developers have budgeted "millions of dollars" on "engineering fees, legal fees, architectural and design fees, permitting fees, bonding fees and other development costs." JA 17. By comparison, the site owner BBSS likewise agreed to a million-dollar civil penalty in the 2007 Consent Decree. JA 95. The alleged expense of litigating these challenges is minimal by comparison – for example, the Developers represent that opposing the mining and grading appeals cost them "tens of thousands of dollars." Appellants' Brief at 33. A marginal cost of about 1% of their legal budget cannot plausibly have blocked the Developers' access to proceed on their permits.

31

This claim is even weaker because, with the sole exception of the nuisance suit, the opponents' challenges of County action did not even name the Developers as defendants. The Developers were only <u>voluntary intervenors</u>. While the Developers had the option to intervene, the County Boards were charged with defending their actions with or without the Developers' help. *See Calvert County Planning Comm'n v. Howlin Realty Management, Inc.*, 364 Md. 301, 320-321, 772 A.2d 1209, 1220 (2001). If the petitions were truly baseless, there was no plausible reason for the Developers to incur "tens of thousands of dollars" to intervene, when the Government was already dealing with them at no cost to the Developers.

The District Court held that a plaintiff could nevertheless claim "sham" liability for an opponent's suit against the government, even though the suit was not directly aimed at the private plaintiff. JA 52. This approach has frightening implications – it would broaden the "sham" exception to any legal challenge to government action which some other private interest wishes to defend, whether or not the plaintiff itself has been haled into court. This is the theory condemned in *Noerr*, 365 U.S. at 139.

**C.    The Developers' Theory Undermines Federalism: *Baltimore Scrap*.**

**1.    Maryland is entitled to police access to its own courts.**

 The Maryland Legislature forbids civil liability for anyone who, without

32

knowledge or reckless disregard of falsehood, "challenges, opposes, or in any other way exercises rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body." Maryland Code, Courts and Judicial Proceedings § 5-807(c). Maryland has a strong policy to protect free access to its courts and agencies, and therefore defines "abuse of process" narrowly. *See Wallace v. Mercantile Bank*, 514 F.Supp.2d 776, 789-790 (D.Md. 2007) *aff'd* 307 Fed.Appx. 720 (4th Cir. 2009).

Nevertheless, the Developers argue for a broader theory of federal liability for "abuse of Maryland's legal process" which Maryland itself rejects. *See One Thousand Fleet*, 346 Md. at 46, 694 A.2d at 960. This undermines the independence of the state legal system.

### 2. Maryland provides a full remedy for the costs of baseless litigation, which the Developers bypass.

Maryland law gave the Developers a remedy to recover their attorneys' fees if any litigation was "maintained without substantial justification." *See* Md. Rule 1-341 (allowing award of attorneys fees jointly against both counsel and party). Rule 1-341 governs petitions for review of administrative actions. *Century I Condominium Ass'n v. Plaza Condominium Joint Venture*, 64 Md.App. 107, 121, 494 A.2d 713, 721 (1985). Rule 1-341 is available even after the offending party voluntarily dismisses

its claim. *See Foor v. Juvenile Services Administration*, 78 Md.App. 151, 172 n.9, 552 A.2d 947, 957 n.9 (1989).

Maryland jealously guards the trial judge's discretion to decide whether litigation was baseless. *Century I*, 64 Md.App. at 120, 494 A.2d at 720. Yet the Developers never sought sanctions in any of the litigation they complain of here. Maryland law treats this as a waiver. *See Bohle v. Thompson*, 78 Md.App. 614, 642, 554 A.2d 818, 832 (1989). There is no reason for the federal courts to do otherwise. *Cf. Holliday Amusement Co. v. South Carolina*, 493 F.3d 404, 406-408 (4th Cir. 2007) (federal Takings claim fails because plaintiffs waived adequate state-law procedures for compensation.)

Instead, the Developers demand that federal courts (who do not even have jurisdiction over Maryland zoning litigation) assess sanctions as an alternative to Maryland Rule 1-341. If the "sham" doctrine expands this far from its original context, it will nullify federalism. The Fourth Circuit warned against this approach in *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 404 (4th Cir. 2001). In *Baltimore Scrap* (as in *Racetrac Petroleum* and this case,) developers demanded federal relief for their opponents' "wrongful" Maryland land-use litigation, citing misrepresentations in the state proceedings. Judge Wilkinson explained these were arguments that should have been made to the Maryland courts. A broad reading of

34

the "sham" exception forces federal courts to supervise all state land-use disputes:

> It is simply not the role of federal courts hearing antitrust law-suits to
>
> reconsider the underlying validity of a state zoning contest. We would
>
> have to immerse ourselves in the minutiae of state civil proceedings and
>
> in effect relitigate the claims that the state courts have already decided.
>
> For the federal courts to entertain this type of antitrust action would
>
> impermissibly impact the right to petition a coordinate system of justice.
>
> Such concerns weigh heavily against creating any broad exception to
>
> the immunity created by *Noerr* and its numerous progeny.

*Baltimore Scrap*, 237 F.3d at 404. This rationale applies fully here. While *Baltimore*

*Scrap* involved an antitrust case, *Noerr-Pennington* is a constitutional doctrine that

applies to all claims against petitioning. "[A]lthough originally developed in the

antitrust context, the [*Noerr-Pennington*] doctrine has now been universally applied

to business torts." *IGEN Int'l*, 335 F.3d at 310.

## D.    The District Court's Rejection of the Access-Barring Condition Is Contrary to Circuit Law.

The District Court did not address *Hospital Building* or *Pendleton*

*Construction*. It rejected *Racetrac Petroleum* as wrongly decided, holding that its

requirement of access-barring has been overruled *sub silentio* by *Professional Real*

*Estate*, which the District Court believed to have eliminated access-barring as an

element. JA 48-50.[3]

This is incorrect. The grant of *certiorari* in *Professional Real Estate* focused on the "baselessness" prong of the *California Motor* test, and so the Court had no occasion to revisit other parts of the doctrine. The Supreme Court and the Fourth Circuit both direct that lower courts may not declare their precedents to have been overruled by implication, just because later decisions focus on other elements of a claim. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000); *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191-192 (4th Cir. 2009); *Mickens v. Taylor*, 240 F.3d 348, 359 (4th Cir.2001) (en banc). Yet the District Court's published decision in this case declares that *Racetrac Petroleum* is no longer good law.

The District Court was wrong. The *Professional Real Estate* Court made it clear that baselessness is not enough. The second, "economic" prong requires the use of process to obstruct. *Professional Real Estate*, 508 U.S. at 58. The District Court described this element merely as "subjective bad faith," which could not be decided on a 12(b)(6) motion. JA 49. This misses the point. Mere "subjective bad faith" to harm one's opponent is not enough; the abuse of process has to obstruct the federal

---

[3]The District Court also distinguished *Racetrac Petroleum* on the ground that, in that case, the plaintiff developer initiated all proceedings. JA 49-50. This is not a persuasive distinction. This case is in the same posture. All litigation here concerned permits or other County benefits that the Developers originally sought and obtained.

plaintiff's ability to proceed by the mere fact of its filing, rather than by seeking a

harmful outcome. *Id.*, 508 U.S. at 61, *citing Omni Outdoor Advertising*, 449 U.S. at

381. The Court reaffirmed the original context of the sham exception: "Our

recognition of a sham in [*California Motor*] signifies that the institution of legal

proceedings 'without probable cause' will give rise to a sham if such activity

effectively "bar[s] . . . competitors from meaningful access to adjudicatory tribunals

and so . . . usurp[s] th[e] decisionmaking process.'" *Professional Real Estate*, 508

U.S. at 58, *quoting California Motor*, 404 U.S. at 512. As Justice Scalia repeated last

year: "The holding of *California Motor Transport* was that the *Noerr–Pennington*

doctrine . . . did not apply to sham litigation that 'sought to bar . . . competitors from

meaningful access to adjudicatory tribunals.'" *Borough of Duryea v. Guarnieri*, ___

U.S. ___, 131 S.Ct. 2488, 2503 (2011) (Scalia, J., concurring).

The District Court was therefore incorrect to disregard Circuit law in

*Racetrac Petroleum, Pendleton Construction* and *Hospital Building*. The dismissal

of the Complaint should be affirmed on this threshold ground alone.

## II.    THE PETITIONS WERE NOT BASELESS.

The Developers' main argument relitigates the Maryland zoning issues. The

Developers' appeal requires the Court to "immerse itself in the minutiae of state civil

proceedings" in just the way rejected in *Baltimore Scrap*, 237 F.3d at 404.

The Developers' argument generally consists of setting forth <u>their</u> case in the underlying litigation, and arguing that if their case (given the benefit of all inferences) should win, the allegation that their opponents' case was "baseless"[4] must survive 12(b)(6) review.

This is not the standard. A "sham" allegation is not evaluated by comparing the claim with the court's ultimate decision. *Professional Real Estate*, 508 U.S. at 60 n.5. The law looks at the underlying litigation from the perspective of the party accused of a "sham"; the law requires no more than some objective grounds for "a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.*, 508 U.S. at 62-63. *Professional Real Estate,* 508 U.S. at 60 n.5, identified this test with the lenient test in *Christianburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 421-422 (1978). Under this standard, there is no plausible claim for baselessness here.

**A.     The August 2008 Challenge to Rezoning**

There were clear grounds to charge that the 2006 rezoning had been procured by material misrepresentations, justifying a Motion to Rescind.

In the 2006 rezoning application, the owner's engineer stated that there were

---

[4]The Developers argued in District Court that they are not even required to prove baselessness. The District Court correctly rejected that argument, JA 50-51, and the Developers abandon the argument on this appeal.

"no environmental issues" on the site. JA 80. The Developers argue here that the owner disclosed the fly ash problem, but the excerpt they cite downplayed the problem, claiming that fly ash is "not a hazardous material." JA 399. These statements are difficult to reconcile with the 2007 Consent Decree, which imposed a million-dollar penalty, JA 95, reciting that the owner had been aware of groundwater contamination since 1999,  had installed a "pump and treat" system in 2004 to address "elevated concentrations of sulfates and heavy metals," JA 91, but that groundwater in 2006 and 2007 still contained heavy metal and sulfates at levels exceeding safe standards. JA 92.

Remarkably, the Developers now claim that "environmental impact" was not relevant to their request for the zoning change. Appellants' Brief at 16. But County Code § 18-16-303(b)(3) includes the "health, safety, and welfare" of present and future residents as a factor to be considered. The Developers also argue defensively that these misrepresentations were not material, because the Administrative Hearing Office had held hearings in 2002 on the fly ash issue. JA 402. That does not make the clean bill of health the owner gave itself in 2006 harmless. This Court need not decide whether the Motion to Rescind the zoning should have been granted. It suffices that the opponents had a substantial basis for making the motion.

The Developers also argue that, even if the Motion to Rescind the Rezoning

was well-founded on the merits, the petitioners' alleged lack of standing rendered the Motion a "sham." This is not the law. A defect in standing does not make an otherwise substantial case into a sham. *See Baltimore Scrap*, 237 F.3d at 400 (dismissal of zoning challenge for lack of standing does not render non-baseless action a sham). The standing issues raised by the County and the Developers turned on disputes over interpretation and degree (*i.e.*, whether the County Code's use of the term "party" permitted aggrieved residents to intervene, or whether it disqualified anyone who had not appeared from the outset of the rezoning case, JA 425-428, or whether each of the movants' residences were sufficiently close to the site to qualify them as "aggrieved," JA 416-428). Even if the Court engages in minute state-law analysis, there is nothing sanctionable about the Motion.

### B.     The 2009 Challenge to the Developers' Failure to Post Bond

The Developers argue that the 2009 challenge over their failure to post a bond was baseless. This is hard to understand. After the opponents challenged the County's temporary waiver of the bond, the Developers relented and posted the bond that the suit sought. The opponents then withdrew their challenge. JA 20-21.

By achieving the result that the litigation sought, the litigation was successful, and therefore not a sham. *Professional Real Estate*, 508 U.S. at 60 n.5. The Developers' voluntary action to grant the relief sought establishes success, despite

the lack of a court order. *See Ohio River Valley Environmental Coalition, Inc. v. Green Valley Coal Co.*, 511 F.3d 407, 415 (4th Cir. 2007); *Rubloff Development Group, Inc. v. SuperValu, Inc.*, ___ F.Supp.2d ___, 2012 WL 1032784 *7 (N.D.Ill. 2012) (developer who made concessions to resolve zoning challenge could not claim later that it was a "sham"); *In re Terazosin Hydrochloride Antitrust Litigation*, 335 F.Supp.2d 1336, 1356-58 & n.13 (S.D.Fla. 2004) (voluntary action granting relief sought establishes success for "sham" purposes).

The Developers claim that the opponents' withdrawal of their challenge after getting what they asked for somehow establishes a "sham." This argument is hard to fathom. By definition, a litigant bent on abusing process would <u>not</u> dismiss a claim upon achieving the result sought. The withdrawal of a suit after relief is obtained demonstrates good faith, not the reverse. *See Terazosin,* 335 F.Supp.2d at 1356.

## C.    The 2010 Challenge to County TIF Vote

It is likewise hard to understand the Developers' argument that the successful challenge to the enactment of the County TIF financing could be called a "sham." The opponents sued for declaratory relief that the County's initial passage of the TIF bill was procedurally defective. After the suit was filed, the County reintroduced the bill following the proper procedures the lawsuit identified. After the County cured the defect, the opponents withdrew the suit. JA 21-22.

41

This was a successful action, because it catalyzed the County to follow correct procedures. *See West Virginia Highlands Conservancy v. Kempthorne*, 569 F.3d 147, 152-153 (4th Cir. 2009) (suit achieves partial success by causing agency to improve its compliance with law, even if other forms of relief are not obtained.)

The Developers seize on the fact that the opponents' Amended Complaint (filed April 12, 2010 after the replacement bill was introduced) added a paragraph arguing that the TIF measure could not be cured by a subsequent reenactment. JA 281. But this allegation was made protectively before the County had completed its compliance. JA 281. It was only the final item in a list of allegations, in which the main relief sought was a declaration of the invalidity of the initial bill. *Id*.

Once this basic objective was achieved, the opponents withdrew their suit. The fact that the opponents did not thereafter press their more ambitious claim does not render the overall suit a "sham"- on the contrary, it shows that the opponents were not pursuing litigation for its own sake.

### D.    The 2010-2011 Environmental Challenges

All environmental claims, including the nuisance suit and the mining and grading appeals, turn on a single core allegation: that there is a fly ash problem at Waugh Chapel that will be exacerbated by continued development. JA 136-165, 541-570. This is not a baseless allegation.

42

### 1.    The fly ash problem is serious: the Bouwer report

The project opponents commissioned Professor Edward Bouwer, Department Chair of Geography and Environmental Engineering at Johns Hopkins to analyze the monitoring well results and geological data for the site. Professor Bouwer issued his report on December 10, 2010. JA 170-187. He concluded:

> [t]he present monitoring plan and compliance points are not adequate to characterize the full extent of contaminant migration downgradient from the site. . . . From an environmental engineering perspective, <u>the construction of the proposed development above the Turner Pit is not recommended until the remediation system is modified to better capture the contaminant plume and a more effective monitoring plan is implemented</u>. Appropriate cleanup for the groundwater may involve excavation of "hot spots" of contamination in the Turner Pit. <u>Development of the site now and planned construction will make it more difficult to access the site in the likelihood that future remediation efforts are required</u>.

JA 175 (emphasis added). While the Circuit Courts deferred to MDE's and the Developers' rosier projections, the Developers cannot plausibly claim that the challenges based on fly ash remediation (including the grading and building permit

appeals) were legally baseless, in view of Professor Bouwer's conclusions.

Appellants' Opening Brief does not even mention Professor Bouwer's report. For example, the Developers argue that the project opponents' affidavits that contaminated groundwater posed a threat to their homes, JA 448-454, must have been "concocted," because a recovery well had been installed to prevent this. But the history of the project indicates that past measures had failed. The 2007 Consent Decree was made necessary because the system installed by the site owner in 2004 failed to prevent heavy metal and sulfates in groundwater, JA 92, and followed only a year after the site owner falsely declared to the County zoning board there were no environmental problems. JA 80. In 2010, just three months after Judge Caroom rejected the residents' affidavits because they not expert opinions, JA 196-197, the Bouwer report corroborated that groundwater contamination had spread and that current remediation efforts were not adequate. JA 175.[5]

The Developers rely heavily on the ultimate decisions of Judges Caroom and Silkworth in the Circuit Court. Those Courts were not persuaded by the opponents' position, in large part out of deference to MDE's and County's enforcement

---

[5] Judge Caroom dismissed the petition concerning the mining permits on standing grounds before Professor Bouwer issued his report. Judge Caroom's rejection of standing appears questionable in light of the Court of Appeals' subsequent *Patuxent Riverkeeper* decision, 422 Md. at 294, 29 A.3d at 584.

44

responsibility. JA 198-200, 258-269. They decided that halting development would be counterproductive[6] – agreeing with the MDE's and the Developers' position, but against the recommendation of the Chair of Johns Hopkins' Department of Geography and Environmental Engineering. JA 175. This Court does not have jurisdiction to review whether the Circuit Court was right. It is enough for "sham" analysis that Professor Bouwer's report supported the opponents' position. Even though Professor Bouwer's report did not persuade the Circuit Court to grant relief, the opponents' position cannot be called baseless in light of it.

## 2.    The Bouwer Report catalyzed the County to improve fly ash remediation.

The County Executive accepted the Bouwer report as a credible analysis that should be followed to improve fly ash remediation. During the residents' litigation against the County and MDE, County Executive John Leopold sent a letter to his co-defendant MDE, citing the Bouwer report as "signal[ing] the need for immediate action" and asking MDE to "implement a remediation plan that is consistent with [the Bouwer report's] findings, as soon as possible." JA 188-89.

_____

[6] The Developers rely on Judge Caroom's conclusion that a stay would interfere with the "momentum in the reclamation process," JA 200, implying that "reclamation" refers to the remediation of fly ash in the groundwater. It does not. The Consent Decree uses the phrase "reclamation" to refer to filling in former mining sites, not to the separate conduct of remediating fly ash. JA 89-91.

45

Leopold also instructed his County's Department of Inspections and Permits to review the Bouwer report, which "gives me significant concerns about how the work at this site might affect the public health and general welfare . . . . [M]y concerns are such that I find it appropriate to ask that your department conduct the necessary reviews to ensure that the placement and handling of Fly Ash on this site is consistent with the [Consent Decree]." JA 190-191.

County Executive Leopold's directives further defeat the Developers' "sham" claim. First, they show that the Developers' co-defendant, the County, did not consider the Bouwer report baseless. Second, it establishes that the opponents' litigation efforts had a significant effect on County policy, even without a court order. Even though County Executive Leopold acted because of the study's persuasive value rather than a court order, the fact remains that the opponents' litigation had a demonstrable influence on County policy. As in *A Fisherman'sBest, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 192 (4th Cir. 2002), the opponents "successfully educated local government officials concerning [their] views and helped to obtain a favorable governmental policy," rendering the efforts non-baseless for *Noerr-Pennington* purposes. *See also West Virginia Highlands*, 569 F.3d at 152-153 (suit is successful if it improves agency compliance).

### 3. The Developers' remaining attacks on the opponents' petitions do not make out a sham.

The Developers' remaining attacks on the opponents' petitions do not establish a sham. For example, the Developers claim the permit appeals alleged violations of the Code "in nothing more than a summary fashion." Appellants' Brief at 31-32. This is unfair. The County's form for Notices of Appeal only has room for six lines for the reason for appeal, JA 465. Petitioners instead attached a separate sheet of paper giving their reasons for appeal. JA 468.[7]

The Developers also argue that appeals on the grading permits were baseless, because the opponents "could not successfully respond" to the Developers' argument that further appeals alleging groundwater contamination were barred by collateral estoppel from Judge Silkworth's decision. Appellants' Brief at 32-33. But Judge

---

[7] The Developers create a false impression of "repetitive" litigation by claiming there have been "fourteen" challenges. Appellants' Brief at 14. This is misleading. The Developers are separately counting each of the petitions for review as to the identical grading and mining permits, even though these challenges were consolidated together. JA 203, 572. In the nuisance suit, the project opponents sought to consolidate all permit issues into a single case, by seeking a single injunction against permits until the fly ash problem was remediated. JA 136-165. The Developers and the County opposed this approach, insisting that any permit challenges be raised one at a time through the administrative process. JA 269. The Circuit Court agreed, requiring the opponents to exhaust remedies as to each permit as it was applied for and granted. *Id*. It is therefore disingenuous for the Developers to suggest now that opposition takes the form of "repetitive" permit-by-permit objections rather than a single lawsuit. This is no more than what the Developers insisted on in state court.

Silkworth denied the claim as to future permits <u>without prejudice</u>, expressly allowing project opponents to bring future challenges against permits not yet issued. JA 269. *See FWB Bank v. Richman*, 354 Md. 472, 494, 731 A.2d 916, 928 (1999).

The Developers also make much of the opponents' withdrawal of the appeals in the face of discovery demands about their financial support. This makes no difference to *Noerr-Pennington* immunity. Third-party financing (even when it is covert) is irrelevant to *Noerr-Pennington* protection. *Baltimore Scrap*, 237 F.3d at 400-401. A withdrawal to avoid intrusive and irrelevant discovery about third-party financing therefore does not deprive the litigant of *Noerr-Pennington* protection. *See also Great Southwest Fire Ins. Co. v. S.M.A., Inc.*, 59 Md.App. 136, 147, 474 A.2d 950, 956 (Md.App. 1984) (voluntary dismissal to forgo opponent's discovery does not render the litigation sanctionable).

## III.    THE FUND IS NOT A "LABOR ORGANIZATION."

The Unions, UFCW Locals 27 and 400, are "labor organizations" under the NLRA. The following section presents the argument of the Appellee Fund only.

The District Court properly dismissed the claims against the Fund on the ground that the Fund is not a "labor organization" under Section 2(5) of the NLRA, 29 U.S.C. § 152(5), because Appellants have failed to allege any facts in support of a finding that the Fund meets the NLRA's definition of "labor organization." The

48

Labor-Management Relations Act, which include the secondary-boycott provisions

the Developers invoke, adopts the NLRA definition. 29 U.S.C. § 142(3).

The term "labor organization," as used in the NLRA, has three essential

elements: (1) employees participate in the organization; (2) the organization exists at

least in part for the purpose of dealing with employers, and (3) these dealings

concern "conditions of work or other statutory subjects." *Electromation, Inc.*, 309

N.L.R.B. 990 (1992). The *Electromation* decision has been cited and followed by

this Circuit. *See N.L.R.B. v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1270

(4th Cir. 1994); *EFCO Corp. v. N.L.R.B.*, 215 F.3d 1318, 2000 WL 632468 (4th Cir.

2000) (unpublished). In their attempt to show that the Fund is a labor organization

under the NLRA, the Developers have made allegations relating to the Fund's tax

exempt status under the Internal Revenue Code ("Code"), the Fund's Trust

Agreement and Form 1024, and the Fund's activities. JA 12 -13. However, none of

these allegations, if assumed to be true, establish that the Fund is a labor

organization under the NLRA, because (1) the Fund's status as a tax-exempt "labor

organization" under the Internal Revenue Code is not relevant to whether the Fund

is a "labor organization" under the NLRA, as a matter of law, and (2) neither the

Fund's Trust Agreement and Form 1024, nor its alleged actions,  provide any

evidence that the Fund (a) has participating employees or (b) exists to deal with employers.

### A. The Fund's Status as a "Labor Organization" under I.R.C. §501(c)(5) Does Not Render it a "Labor Organization" under the NLRA.

In alleging that the Fund is a labor organization under the NLRA, Appellants rely heavily on the Fund's status as a tax exempt labor organization under Section 501(c)(5) of the Internal Revenue Code, 26 U.S.C. §501(c)(5). This reliance is fatally misplaced. The fact that both the NLRA and the Code use the same term does not mean that the definition of labor organization under the Code can be imported into the NLRA, or vice versa.

Section 2(5) of the NLRA defines "labor organization" as follows:

> any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. §152(5). It also expressly states that this definition applies "[w]hen used in this Act [29 U.S.C. §§ 151-158, 159-168]." 29 U.S.C. § 152. To apply the NLRA's definition of "labor organization" to another statute, such as the Internal Revenue Code, would "make meaningless the limitation Congress placed on the definition." *Andrews v. United States,* 441 F.3d 220, 226 (4th Cir. 2006).

50

While the Labor Management Relations Act, has expressly incorporated the NLRA's definition of "labor organization," 29 U.S.C. § 142(3), the Internal Revenue Code has not. To the contrary, regulations issued under Internal Revenue Code, 26 U.S.C. §501(c)(5) contain a completely distinct definition of "labor organization," as organizations that "(1) [h]ave no net earnings inuring to the benefit of any member, and (2) [h]ave as their objects the betterment of the conditions of those engaged in such pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their respective occupations." 26 C.F.R. § 1.501(c)(5)-1(a).

Clearly absent from the Code and the regulations thereunder is any language incorporating the NLRA's definition of "labor organization" or even the basic functions of an NLRA labor organization. "In similar circumstances, where there is an 'absence of any explicit connector between' the two statutes, the Supreme Court has declined to read a definition from one statute into another, finding the absence of a cross-reference to be 'revealing.'" *In re Princo Corp.*, 486 F.3d 1365, 1368 (Fed. Cir. 2007) (*quoting United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220 (1996)). Further, specifically with regard to the NLRA and the Code, the First Circuit has cautioned that it is "hesitant to import definitions from statutes with unrelated or cross purposes. The [Internal Revenue Code] and the

51

NLRA have very different objectives." *Tupper v. U.S.*, 134 F.3d 444, 446 n.1 (1st
Cir. 1998).

Thus, because an organization's status as a tax-exempt labor organization
under Section 501(c)(5) of the Code has no relationship to the organization's status
under the NLRA, and because there is no legal basis for linking the NLRA's
definition of "labor organization" to the definition of the same term under the Code,
the Appellants' allegations regarding the Fund's tax exempt status do not support a
finding that the Fund is a labor organization under the NLRA.

**B.  The Fund's Trust Agreement and Internal Revenue Code Form 1024 Do Not Demonstrate That the Fund Is an NLRA "Labor Organization."**

The Developers also attempt to rely on the Fund's Form 1024, *Application for
Recognition of Exemption under Section 501(a)*, and the Fund's Trust Agreement, in
support of their claim that the Fund is a "labor organization" under the NLRA.
However, on their face, these documents are inconsistent with Appellants'
conclusory argument that the Fund is an NLRA "labor organization."

The Developers  allege that the Fund's Form 1024 describes the Fund as:

> A Joint Management Committee as defined by Section
> 302(c)(9) of the Labor Management Relations Act. Purposes
> and objectives of the Fund may include improving labor-
> management relations, improving job security, improving
> organizational effectiveness in the retail industry, enhancing

52

> economic development and monitoring the conditions of
> those engaged in the retail food industry.

JA 12-13. The Developers also allege that the Fund's Form 1024 states that the

Fund's activities in pursuit of its purposes are strictly limited to "petitioning

activity," including the petitioning of legislative, executive and judicial bodies. JA

12-13. Thus, the actual factual allegations made by the Appellants are that the Fund

is a Joint Labor Management Committee under the Labor Management Relations Act

that seeks to improve labor-management relations between unions and employers

through petitioning activities – a very different purpose than representing employees

with regard to employers.

Similarly, the Fund's Trust Agreement specifically provides that the Fund will

fulfill its stated purposes "<u>solely</u> by engaging in Government Petitioning Activities."

JA 13 (emphasis added).  The Trust Agreement further provides that the "Trustees

are <u>expressly prohibited</u> from authorizing, ratifying, or participating directly or

indirectly in any picketing, boycotting or other union … collective activities." JA 13

(emphasis added).

Thus, the Fund's Trust Document and Form 1024 – alleged as facts in the

Appellants' prior pleadings – do not offer any factual support for the Developers'

claim that the Fund is a "labor organization" under the NLRA. In fact, these

53

allegations only support the conclusion that the Fund does not fit the definition of a "labor organization" under the NLRA.

**C.    The Fund Conduct Alleged by the Appellants Does Not Demonstrate That the Fund Is an NLRA "Labor Organization."**

The Developers attempt to use their allegation that the Fund engaged in secondary boycott activity under the NLRA as support for their allegation that the Fund is a "labor organization" under the NLRA.  Aside from the fact that non-obstructive petitioning is not a "coercive" boycott, as we argue in Part I.C above, this circular argument reflects Appellants' lack of understanding of the NLRA. Nothing in the statute supports the conclusion that an entity engaging in what would be secondary boycott activity if performed by a labor organization automatically makes the entity a "labor organization" because it did so. In fact, the NLRA only bans secondary boycott type activities by "labor organizations." 29 U.S.C. § 158(b)(4)(ii)(B).  Non-"labor organization" entities are not prohibited from engaging in such activities.

Further, Appellants' allegations of purported secondary boycott activity by the Fund do not satisfy any essential element of the NLRA's definition of a "labor organization," since such activity does not include maintaining an organization with participating employees or dealing with employers regarding the conditions of employment.

54

The only other Fund conduct alleged by Appellants in support of their claim that the Fund deals with employers is an alleged telephone call made by the Fund's executive director to the president of Greenberg Gibbons, a non-party developer, requesting a contact at Wegmans so as to "discuss unionization," and threatening to "fight every project you develop where Wegmans is a tenant." JA 18. Appellants argue that this phone call "reflect[s] the [Fund's] participation in efforts to unionize Wegmans." JA 18. However, this alleged phone call was made to a <u>developer</u>, not an employer, and thus cannot be viewed as evidence that the Fund "deals with employers." Further, even if this developer were an employer in the retail food industry, the Amended Complaint describes a single isolated instance, rather than a pattern or practice of dealing.

As the Fourth Circuit has clearly stated, an organization "which does not exist for the purpose of dealing with, or does not actually deal with, an employer over matters affecting the employment cannot be deemed to be a 'labor organization' as that term is used in the Act." *N.L.R.B. v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1270 (4th Cir. 1994). "Dealing with" refers to a "bilateral mechanism" that involves communication exchanged between employees and management. *EFCO*, 2000 WL 632468 *5; *Peninsula*, 36 F.3d at 1271. This bilateral mechanism "ordinarily entails a <u>pattern or practice</u> in which a group of employees, over time,

55

makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed … [but] if there are only <u>isolated instances</u> in which the group makes ad hoc proposals to management … the element of dealing is missing." *Peninsula*, 36 F.3d at 1272 (emphasis added).

Appellants attempt to bolster their claim that the Fund deals with employers by citing to a Supreme Court decision and two NLRB decisions. App. Br. at 40-43. However, these authorities do not support their position because the organizations at issue in these decisions are easily distinguishable, based on the Appellants' allegations.

In the Supreme Court decision, *N.L.R.B. v. Cabot Carbon*, the organizations at issue were groups of employees, known as "employee committees," established by management to discuss with management matters of mutual interest, including grievances and working conditions. 360 U.S. 203, 204-05 (1959). The Supreme Court determined that the committees were "labor organizations" under Section 2(5) of the NLRA because they were "dealing with employers concerning grievances," which "alone brings these Committees squarely within the statutory definition." *Id.* at 213.

In contrast to *Cabot Carbon*, Appellants have not alleged that the Fund is comprised of employees and exists to deal with employers concerning "grievances,

56

labor disputes, wages, rates of pay, hours of employment, or conditions of work," the statutory topics listed in the NLRA's definition of "labor organization." 29 U.S.C. §152(5). In fact, in contrast to the determinative facts in *Cabot Carbon*, the Appellants have made no allegation that the Fund communicates with employers regarding grievances.

The two National Labor Relations Board decisions relied upon by the Appellants also are distinguishable because they both concern whether trade councils comprised solely of unions and governed by the constitution of the AFL-CIO Building Trades Department were labor organizations that engaged in unlawful picketing. *Wyoming Valley Bldg. Constr. Trades Council*, 211 N.L.R.B. 1049 (1974); *Bldg. & Constr. Trades Council of Reading & Berks County*, 155 N.L.R.B. 1184 (1965). The two councils, the Wyoming Valley Building Construction Trades Council and the Building and Construction Council of Reading and Berks County, were comprised solely of 22 and 19 constituent local unions, respectively, and the councils served as the units through which the unions acted together in picketing. *Wyoming Valley*, 211 N.L.R.B. at 1054; *Bldg. & Constr. Trades Council*, 155 N.L.R.B. at 1186-87. In essence, the trade councils acted as agents for the unions, in part for the purpose of "organiz[ing] employees of nonunion contractors," *Bldg. & Constr.*, 155 N.L.R.B. at 1186-87, and "dealing with employers at least in respect to

57

grievances, labor disputes and conditions of work," *Wyoming Valley*, 211 N.L.R.B. at 1054.

Unlike the trade councils, Appellants have alleged that "representatives" of both unions and management serve as Trustees of the Fund, JA 12, and Appellants have not alleged that the Fund is an agent for unions or acts solely on behalf of unions. To the contrary, as quoted from the Fund's Form 1024 in the Appellants' Amended Complaint, the Fund seeks to benefit both labor and management through its stated purpose of "improving labor-management relationships . . . ." JA 12-13. Thus, the Appellants' allegations do not in any way demonstrate that the Fund "deal[s] with" employers.

Appellants also have failed to allege any facts demonstrating that "employees participate" in the Fund, which is an essential element of the NLRA's "labor organization" definition. *Electromation*, 309 N.L.R.B. at 990. Appellants' only allegation that is even remotely related to this element of the NLRA's definition is that representatives of Local 27 and Local 400 serve as Trustees of the Fund. JA 12. This allegation does not show employee participation in the Fund and thus does nothing to bring the Fund within the definition of "labor organization" under the NLRA. The Supreme Court has held that a trustee appointed by labor or by management has fiduciary duties to the fund, not to the entity that appointed him.

58

*N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 334 (1981) ("The language and legislative history of [the Labor Management Relations Act] § 302(c)(5) and ERISA therefore demonstrates that an employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him."). *See also Grant*, 627 F.Supp. at 313 (holding that a joint council comprised of local union and employer representatives was not a labor organization because local unions, not employees, participated in the council); *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 338 (1981) (holding that employer-appointed trustee for jointly established benefit fund was not a representative of the employer for collective bargaining purposes within the meaning of 29 U.S.C. § 158(b)(1)(B)).

Appellants' inability to allege facts that, if true, show the Fund to be a "labor organization" under the NLRA is not surprising, since courts that have examined the NLRA's definition of "labor organization" have found that funds jointly established by labor unions and employer associations, as Appellants themselves described the Fund, JA 12-13, are not labor organizations. *See, e.g., Molnar v. Wibbelt*, 789 F.2d 244, 251 (3d Cir. 1986) (holding defendants failed to state a counterclaim for unfair labor practices because jointly established education and welfare fund was not a labor organization); *McCaffrey v. Rex Motor Transp., Inc.*, 672 F.2d 246, 249 n.2 (1st Cir. 1982) (observing that a jointly established pension fund "does not appear to

59

fall within the definition of a 'labor organization' set forth in 29 U.S.C. §152(5)");

*Sacramento Valley Chapter, Nat'l Elec. Contractors Ass'n v. Wallace*, No. 82-568, 1983 WL 2093 *2 (E.D. Cal. 1983) (dismissing unfair labor practices claim because a jointly established trust fund does not fit the definition of a labor organization).

Based on the foregoing, the Appellants' allegations do not support a finding that the Fund is a "labor organization" under the NLRA, and thus the District Court correctly dismissed the Appellants' claims against the Fund.

## CONCLUSION

The District Court's dismissal of the Complaint should be affirmed.

June 22, 2012                           Respectfully submitted,


 s/ Michael T. Anderson
Michael T. Anderson

Michael T. Anderson (arguing counsel)
Arlus J. Stephens
Lorrie E. Bradley
MURPHY ANDERSON PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620; Fax: (202) 223-8651
Attorneys for Appellee UFCW Local 27

Joel A. Smith
David Gray Wright
KAHN, SMITH & COLLINS, P.A.
201 North Charles Street, 10th Floor
Baltimore, MD  21201
(410) 244-1010; Fax: (410) 244-8001
Attorneys for Appellee UFCW Local 27

Carey R. Butsavage
John A. Durkalski
BUTSAVAGE & ASSOCIATES, P.C.
1920 L Street NW, Suite 510
Washington, DC  20036
(202) 861-9700; Fax: (202) 861-9711
Attorneys for Appellee UFCW Local 400

Barry S. Slevin (arguing counsel)
Sharon M. Goodman
Sarah Sanchez
Laura O. Aradi
SLEVIN & HART, P.C.
1625 Massachusetts Ave. NW, Suite 450
Washington, DC 20036
(202) 797-8700; Fax: (202) 234-8231
Attorneys for Appellee Mid-Atlantic Retail
Food Industry Joint Labor Management Fund

# STATUTORY SUPPLEMENT

## 26 U.S.C. §501(c)(5)

(a) An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.
(c) The following organizations are referred to in subsection (a):
    (5) Labor, agricultural, or horticultural organizations.

## 29 U.S.C. §152(5)

The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

## 29 U.S.C. §§158(b)(4)(B)

(b)It shall be an unfair labor practice for a labor organization or its agents—

    (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

        (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**29 U.S.C. § 187**

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

**29 U.S.C. §186(c)(9)**

The provisions of this section shall not be applicable . . . with respect to money or other things of value paid by an employer to a plant, area or industry wide labor management committee established for one or more of the purposes set forth in section 5(b) of the Labor Management Cooperation Act of 1978.

**Maryland Rule 1-341**

In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

**Maryland Rule 7-205**

The filing of a petition does not stay the order or action of the administrative agency. Upon motion and after hearing, the court may grant a stay, unless prohibited by law, upon the conditions as to bond or otherwise that the court considers proper.

**Maryland Code, Courts and Judicial Proceedings § 5-807(c)**

(c)     A defendant in a SLAPP suit is not civilly liable for communicating with a federal, State, or local government body or the public at large, if the defendant, without constitutional malice, reports on, comments on, rules on, challenges, opposes, or in any other way exercises rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body.

**Anne Arundel County Code § 17-2-108(b)**

**When modification may be denied.** An application for a modification may be denied if requested solely because compliance would add significantly to development costs or if requested solely for the convenience of the developer, such as when the land is not usable because of error or poor assumptions on the part of the developer.

**Anne Arundel County Code § 17-6-702**

(a)     **Generally.** Except as provided in subsection (b), a public works agreement and forestation agreement shall be accompanied by security in the amount required by Title 11. The security shall be in the form of a cash deposit, certified check, cashier's check, irrevocable letter of credit, or bond from a bonding company or financial institution acceptable to the County. When security is required to be in the amount of the estimated cost of improvements, the developer shall provide to the Office of Planning and Zoning for its consideration and approval a cost estimate for completion of the improvements required by the agreement.

(b)     **Exceptions.** A public works agreement for minor utility work, as determined by the County, or for a Mayo Tank System need not be accompanied by security.

**Anne Arundel County Code § 18-16-303(b)**

**Requirements for approval.** A rezoning may not be granted unless the Administrative Hearing Officer makes the following affirmative findings:

(1)     There was a mistake in the zoning map or the character of the neighborhood has changed to such an extent that the zoning map should be changed;

(2)     The new zoning classification conforms to the General Development Plan in relation to land use, number of dwelling units or type and intensity of nonresidential buildings, and location;

(3)     There is compatibility between the uses of the property as reclassified and the surrounding land uses, so as to promote the health, safety, and welfare of present and future residents of the County; and

(4)     For a property located in the critical area:

(i)     the uses allowed in the proposed zoning classification are compatible with the critical area land use designation and development standards for the property; and

(ii)     the Critical Area Commission staff has recommended approval of the rezoning if the basis for the rezoning is that the character of the neighborhood has changed to such an extent that the zoning map should be changed.

## Anne Arundel County Code § 18-16-404(a)

**Grounds.** On motion of the County or an aggrieved party, or on the Administrative Hearing Officer's own initiative, approval of an application for a rezoning, variance or special exception shall be rescinded, suspended, or modified if the Administrative Hearing Officer determines, after a hearing, that:

(1)     the approval or grant was based on a fraudulent misrepresentation of material information in the application, testimony, administrative site plan, or other supporting documents; or

(2)     the use of the property deviates from the approved administrative site plan, an allowed use under the rezoning, or any conditions imposed.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not oppose oral argument.

While the issues are clear, and the Court may properly decide the case without argument, Appellees always welcome the opportunity to address the Court.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App. P. 32(a)(3)(B)(i), I, Michael T. Anderson hereby certify the attached APPELLEES' JOINT BRIEF in Case No. 12-1429 is in 14 point, proportionally spaced, Times New Roman type face and contains less than 13,463 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), on the basis of a word count made by WordPerfect version XP word processing software that counts words in both text and footnotes.

<u>s/ Michael T. Anderson</u>
Michael T. Anderson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing BRIEF OF APPELLEE was filed this

22nd day of June, 2012, using the CM/ECF system, which will automatically send

electronic notification of filing to all counsel of record.


 s/ Arlus J. Stephens
Arlus J. Stephens